T.S. FALLS, Sergeant Cummins
Unit, ADC, Appellant,

v.

John NESBITT, Appellee.

No. 91–3569EAPB.

United States Court of Appeals,
Eighth Circuit.

Submitted April 16, 1992.

Decided June 4, 1992.

Melissa K. Rust, Little Rock, Ark., argued (John D. Harris, on the brief), for appellant.

Stephen E. Snider, Little Rock, Ark., argued, for appellee.

Before FAGG and WOLLMAN, Circuit Judges, and BOGUE,* Senior District Judge.

BOGUE, Senior District Judge.

## I. INTRODUCTION

This case represents another chapter in the continuing saga of inmate violence in our nation's prisons. While an inmate at the Cummins Unit of the Arkansas Department of Corrections, Respondent John Nesbitt (Nesbitt) was stabbed by fellow inmate Kenny Hamm (Hamm). Nesbitt, a pro se complainant, brought suit under 42 U.S.C. § 1983, seeking money damages and injunctive relief. The magistrate judge[1] entered judgment for Nesbitt and against Petitioner Lieutenant T.S. Falls (Falls) in the amount of $250; and the magistrate enjoined Falls from housing in the future protective custody (PC) inmates with general population inmates. We reverse.

## II. FACTS

The operative facts in this case are not in dispute. On October 21, 1989, Nesbitt was housed in protective custody in 14 Barracks[2] in the Cummins Unit. PC, as it is called, is a special section of the prison reserved for those prisoners who are slight of build, physically weaker than the typical inmate, preyed upon, or, in many cases, homosexuals. Nesbitt is both small in stature and a homosexual.

While in PC on October 21, 1989, Nesbitt left his cell to inform Sergeant Parker and,

later, Lieutenant Falls, both Arkansas Department of Corrections officers, that he (Nesbitt) and his current cellmate were not getting along. Nesbitt then requested that he be moved to another cell. Whether Sergeant Parker refused Nesbitt's request or simply stated that he lacked the authority to make such a change, Nesbitt's request for a cell change was denied. Nesbitt refused to return to his cell and, thereafter, was escorted to another building to meet with Lieutenant Falls (Falls). At this time, Nesbitt was "written up" for failing to return to his cell as ordered by Sergeant Parker.

Falls decided to transfer Nesbitt temporarily to 16 Barracks, which houses inmates on Administrative Segregation pending the outcome of disciplinary proceedings. Prior to the transfer, Falls checked Nesbitt's "enemy alert list" to determine if anyone on Nesbitt's list was presently housed in 16 Barracks, and none were found. Next, Nesbitt was asked to fill out a housing roster, in which he stated that he could share a cell with anyone except black inmates. Nesbitt was finally placed in Cell 312 with Hamm, a white inmate. On October 24, 1989, Hamm stabbed Nesbitt in the chest with a homemade knife. On this same day, Nesbitt executed an affidavit stating that he (Nesbitt) had no reason to believe that Hamm would harm him.

Nesbitt brought suit under 42 U.S.C. § 1983, against Falls, Parker, and Officer Starks, the officer who escorted Nesbitt to Cell 312. The magistrate dismissed Nesbitt's suit against officers Starks and Parker; Falls, however, was ordered to pay Nesbitt $250 in damages, and was enjoined from housing PC inmates with non-PC inmates.

---

* The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Jerry W. Cavaneau, United States Magistrate, United States District Court, Eastern District of Arkansas, Pine Bluff Division.

2. All protective custody inmates are housed in 14 Barracks. One month prior to his move to

Administrative Segregation, Nesbitt requested that he be moved from PC to the general population, claiming that he was capable of getting along with the general prison population. While not determinative of the issues before us, this request does not represent the mindset of an inmate who views inmates outside of PC as creating for him a "pervasive risk of harm."

## III. STANDARD OF REVIEW

■ The trial judge's findings of fact will not be set aside unless they are found to be "clearly erroneous." Fed.R.Civ.P. 52(a). Mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewable de novo. *United States v. McConney*, 728 F.2d 1195, 1199–1204 (9th Cir.1984) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Because our decision is predominantly one of determining whether the established facts fall within the relevant legal definition,[3] albeit a constitutional definition, we apply a de novo standard of review. *Id.* at 1202–03.

## IV. EIGHTH AMENDMENT

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." Until recent years, the Cruel and Unusual Punishment Clause was not deemed to apply at all to deprivations that were not inflicted as part of the sentence for a crime. For generations, judges and commentators regarded the Eighth Amendment as applying only to torturous punishments meted out by statutes or sentencing judges, and not generally to any hardship that might befall a prisoner during incarceration. *See Hudson v. McMillian*, — U.S. —, —, 112 S.Ct. 995, 1005, 117 L.Ed.2d 156, dissent, J. Thomas (1992). In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976),

however, the Supreme Court expanded the reach of the Cruel and Unusual Punishment Clause.

In *Estelle*, the Court addressed the application of the Eighth Amendment to an inmate allegedly denied adequate medical services while in prison. Citing the historical roots of the Eighth Amendment, and its ultimate expansion beyond the narrow moorings of "comparing challenged methods of execution to concededly inhuman techniques of punishment," *Id.* 97 S.Ct. at 290, citing *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345 (1879), the Court highlighted those ideals which stand as the hallmark of constitutional jurisprudence.[4] The Court "held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society;" and, ultimately, "that [t]hese elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.*

■ Since *Estelle*, the Eighth Amendment has evolved to include a prisoner's right to be protected from harm by fellow inmates. *See Smith v. Marcantonio*, 910 F.2d 500 (8th Cir.1990). To prevail in a suit under 42 U.S.C. § 1983, however, an inmate seeking damages from prison officials for subjecting him to cruel and unusual punishment by failing to protect him from assault by another inmate "must show something more than mere inadvertence or negligence. He must show the defendants

---

**3.** For example, the question of whether specific conduct is constitutionally protected is ultimately an issue of law by which the lower court's law findings do not bind the reviewing court. Childress & Davis, *Federal Standards of Review*, Second Ed.1992, § 2–13. In the case before us, there is no dispute that the Eighth Amendment ban on "cruel and unusual punishment" applies to a prisoner's right to be protected from harm by his fellow inmates. The issue on appeal, however, asks whether those constitutional protections apply to the facts of this case.

**4.** The Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...," *Jackson v. Bishop*, 404 F.2d 571, 579 (C.A.8 1968), against which we must evaluate penal measures. Thus,

we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *see also Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); (joint opinion); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed 793 (1910), or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra*, 428 U.S. at 173, 96 S.Ct. at 2925 (joint opinion); see also *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947); *Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1879).

were deliberately indifferent to his constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates." *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir.1991), citing *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir.), *cert. denied*, 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984).

To establish "reckless disregard" by prison officials, an inmate must show that he was faced with a "pervasive risk of harm" and that the prison officials failed to respond reasonably to that risk. *Id.; see also Bailey v. Wood*, 909 F.2d 1197, 1199 (8th Cir.1990); *Prom v. White*, 762 F.2d 635, 637 (8th Cir.1985). Under our analysis, a "pervasive risk of harm"

> may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency that prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures...."

*Andrews*, 929 F.2d at 1330.

■ We need not address the second prong in the analysis—that prison officials failed to respond reasonably to a "pervasive risk of harm"—because Nesbitt did not establish the threshold issue: That sharing a cell with Hamm created a pervasive risk sufficient to put prison officials on notice of imminent harm or danger to Nesbitt. A "pervasive risk of harm" requires evidence of frequent violence or sexual assaults which places a prisoner or group of prisoners in reasonable fear for their safety; and prisoners must apprise the prison officials of the existence of the problem and the need for protective measures. In every case, a "pervasive risk" is something more than a single incident and something less than a riot.

Nesbitt failed to put on any evidence which satisfies even the most charitable reading of the notion of a "pervasive risk of harm." Prior to sharing a cell, Nesbitt did not know inmate Hamm, the inmate who stabbed him, nor did Nesbitt have any reason to fear Hamm. When Nesbitt filled out his housing roster prior to his transfer, his only request was that he not share a cell with a black inmate. Hamm was white. Ironically, in an affidavit executed by Nesbitt on the same day he was stabbed, Nesbitt testified as to his own incredulity at Hamm's violent reaction. Said Nesbitt, "[u]p until that time [the stabbing], I had no reason to believe that inmate Hamm was going to try to kill me." *See Appellant's Appendix*, Defendant's Exhibit 3, A–82.

In *Smith*, we were faced with a similar factually impoverished claim. The prisoner, Smith, was severely injured when several unknown prison inmates poured a scalding liquid on Smith as he slept. Despite the gravity of Smith's injuries, we concluded that the inquiry into Smith's claims began and ended with his deposition testimony:

Q. Do you have any reason to believe [ ] anybody might want to scald you?

Smith: No.

Q. Did you give any of the [prison officials] any reason to believe that somebody might scald you?

Smith: No, because I [didn't] know. It's [ ] something that just happened.

\*　　\*　　\*　　\*　　\*　　\*

Q. Did [you feel] at any time prior to this incident [ ] that your life was in danger?

Smith: No.

\*　　\*　　\*　　\*　　\*　　\*

Q. Did you think that Officer Brady could have done anything to prevent this?

Smith: No, I don't believe he could.

Q. How about Mr. Marcantonio, could he have done anything to prevent this from happening?

Smith: No, I don't think so. He wasn't there at the time ... that it happened, no.

*Smith,* 910 F.2d at 502.

In *Smith,* the deposition testimony standing alone established the absence of a pervasive risk of harm. We are confronted with the same damning admissions in this case. Nesbitt admits, in a single sentence in his affidavit, that he was caught completely by surprise when Hamm unleashed what seemed to be an unprovoked attack. A single episode of violence, without warning or suspicion, is insufficient to establish a pervasive risk of harm, particularly when the injured inmate views the attack as an isolated incident.[5]

Next, at oral argument, Nesbitt reasoned that any time a PC inmate is forced to share a cell with an inmate from the general prison population, an Eighth Amendment claim arises.[6] In other words,

in the absence of any objective evidence that a risk of harm is imminent, Nesbitt argues that a prison official's violation of an internal regulation is a violation of constitutional dimension under the Eighth Amendment.[7] We reject such an approach to Eighth Amendment jurisprudence.

It is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). While Falls may have been negligent in placing Nesbitt, a PC inmate, in a cell with a non-PC inmate—even temporarily—the evidence does not reasonably support a conclusion that Falls' decision to house Nesbitt and Hamm together represented either a callous disregard for or reckless indifference to any potential risk which Nesbitt

---

5. In *Siegel, supra,* we addressed an inmate's claim involving a single incident of violence. "[T]he magistrate concluded that 'even if the altercation did take place as plaintiff alleges, plaintiff has still only alleged isolated incidents of violence by inmate Wright, not sufficient to show the existence of a pervasive risk of harm.'" *Id.* at 1330, citing *Andrews v. Siegel,* No. 3–86–737, Magistrate's Report and Recommendation (Jan. 17, 1990). We concluded that the "district court correctly granted summary judgment dismissing the complaint because Andrews has not shown that appellees recklessly disregarded, or were deliberately indifferent to, his Eighth Amendment right to be free from violent attacks by other inmates." *Id.*

6. During oral argument, the following dialogue narrowed Nesbitt's Eighth Amendment claim:
   Attorney: ... The fact that he [Nesbitt] is on protective custody status should clearly apprise the official of the need for protection. The fact that he is on protective custody in the first place should apprise Lieutenant Falls, this is an inmate that needs special protection, this is an inmate who would be placing a pervasive risk of harm if placed with a non-protective custody inmate.
   Court: Are you suggesting a per se rule?
   Attorney: Well, I'm suggesting—yes, I guess I am—if an inmate is on protective custody, it should be clear to the guards that placing him with a non-protective custody inmate would be subjecting him to a pervasive risk of harm.
   \*    \*    \*    \*    \*    \*
   Court: Do you think that Falls should have anticipated what happened?

Attorney: Well, I don't think that I'm asking that he anticipate the specific injury that occurred. I think that I noted that the standard that we need to meet is that he subjected the inmate to a pervasive risk of harm. I think in placing him with a non-protective custody inmate was in fact subjecting him to a pervasive risk of harm.
   \*    \*    \*    \*    \*    \*
   Court: But again, this is still unclear in my mind. What was the specific basis for Magistrate Judge Cavaneau's finding?
   Attorney: He found that Lieutenant Falls subjected Mr. Nesbitt to a pervasive risk of harm by placing him, a protective custody inmate, in the cell with a non-protective custody inmate.

7. Section 837 of the Administrative Regulations, State of Arkansas Department of Correction, provides that the policy of the Department with respect to protective custody is a follows:
   To provide at each maximum-security correctional center a Protective Custody Unit—a designated area containing adequate housing space which is separate from contact with the general and disciplinary segregation populations. Inmates who believe that their safety and security are being threatened in the general population and who request protective custody placement shall be assigned to protective custody program status until such time as a determination is made that they may return to the general population without fear for their safety and security.

might face. In fact, Falls might have done things differently, and perhaps he might in the future, but using post-injury events does nothing more than "exalt hindsight over foreseeability." *Bailey*, 909 F.2d at 1200.

■ Our decision today stands for the proposition that a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim of "cruel and unusual punishment," in the absence of objective evidence demonstrating that prison officials were deliberately indifferent to a prisoner's constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates. *See Martin v. White*, 742 F.2d 469 (8th Cir.1984). Like the "pervasive risk" standard discussed earlier, a prisoner must show that the prison official's act—or failure to act—demonstrated deliberate indifference, i.e., an "inmate must show something more than mere inadvertence or negligence." *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir.1984). Under this standard, Nesbitt, by his own admission, not only was without fear of Hamm, he admitted that Hamm's attack was without provocation or warning. Therefore, no Eighth Amendment violation exists.

### V. INJUNCTIVE RELIEF

The magistrate judge enjoined Falls from housing in the future PC inmates with non-PC inmates. Our disposition of the Eighth Amendment issue also disposes of the magistrate's injunctive relief.

"An injunction must be tailored to remedy specific harm shown. * * * Furthermore, title 42 U.S.C. § 1983, the title under which this action was brought, requires inter alia that, in order for liability to ensue, a person must be subjected to a deprivation of ... rights ... secured by the constitution and laws ..." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982). We have no Constitutional violation; there-

fore, the use of an injunction is unnecessary since the conduct sought to be enjoined no longer represents a claim which violates the Eighth Amendment.

### VI. CONCLUSION

Prisons are, by the very nature of many of those persons housed within their walls, dangerous, violent, and oftentimes unpredictable.[8] An unfortunate by-product of our prison system is the incidence of violence between inmates. While unfortunate, all such incidents of violence do not violate the Eighth Amendment's ban on cruel and unusual punishment. Only when prison officials are deliberately indifferent, through intentional acts or reckless disregard to prisoner's rights, does the claim merit Constitutional attention under the Eighth Amendment. Nesbitt has failed to show, at any level, that Falls' conduct was sufficiently reckless to justify his Eighth Amendment claim. Therefore, the decision of the magistrate judge is reversed.

---

8. As we stated in *Siegel v. Andrews*, 929 F.2d 1326, 1330–31 (8th Cir.1991), "Some violence in prisons may be unavoidable due to the charac-

ter of the prisoners ..." *Citing Martin v. White*, 742 F.2d 469, 475 (8th Cir.1984).