**Jeffrey HERSHBERGER, Steven Schakel, Thomas Sherwood, Kenneth Wheeler, Scott Olmstead, Thomas Rayer, Ernest Douglas, on their own behalf and on behalf of others similarly situated, Plaintiffs,**

**v.**

**Fred SCALETTA, John A. Thalacker, Larry Brimeyer, Captain Salviati, and Lieutenant Lewis, Russell Behrens, and Jerry Manternach, Defendants.**

**No. C 91–0191.**

United States District Court, N.D. Iowa, Cedar Rapids Division.

Oct. 4, 1993.

Philip B. Mears, Iowa City, IA, for plaintiffs.

Kristin W. Ensign, Asst. Atty. Gen., Des Moines, IA, for defendants.

## ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to trial on the merits conducted March 9,

1993, at the Iowa Men's Reformatory at Anamosa, Iowa (IMR). By order dated June 25, 1993, the parties consented to have this matter tried before the undersigned United States Magistrate Judge. Three of the seven plaintiffs were present at the time of trial and were represented by Philip Mears. The defendants were represented by Kristin Ensign.

## INTRODUCTION

In this case, the plaintiffs challenge institutional rules that (1) deny free legal postage to indigent inmates, (2) apply monthly service charges to inmates whose accounts have negative balances due to demands for legal postage, and (3) set a presumptive limit on prisoner indebtedness to the institution beyond which prisoners ordinarily cannot incur debt for legal postage. In addition, the plaintiffs challenge the postage regulations at the institution claiming they deny rights of familial privacy. Finally, the plaintiffs challenge regulations governing inmates in long-term disciplinary detention statuses that require them to keep moving while exercising and which permit institutional officials to rescind exercise privileges without due process in response to misbehavior in the exercise area.

The policy of denying free postage to indigent inmates for legal mail is unconstitutional and is hereby enjoined. Similarly, the practice of charging inmates 50 cents per month for having a negative balance in their account is enjoined. The policy of forbidding inmates to exceed $7.50 in the red is unconstitutional as applied. However, as it pertains to the issue of postage for personal correspondence, the policy is not violative of inmate rights. Finally, the exercise regulations are rationally related to legitimate penological interests and do not violate inmates' Eighth or Fourteenth Amendment rights.

1. This very specific recollection of Douglas does not agree with the last page of defendants' Exhibit A which purports to track the inmate's location in IMR. Suffice it to say that the plaintiff has experienced substantial disciplinary detention since his incarceration.

## FINDINGS OF FACT

There are seven plaintiffs in this case. Five of them have been discharged from the Iowa penal system between the filing of this case and trial. Only Ernest Douglas and Scott Olmstead remain incarcerated. Inmates Steven Schakel, Thomas Sherwood, Kenneth Wheeler, and Thomas Rayer failed to appear for trial. Accordingly, the court knows little about their claims. Their claims were not subject to cross-examination. These four plaintiffs' cases are dismissed for want of prosecution.

### Ernest Douglas

Ernest Douglas came to the IMR in May 1991. He was sent to another institution in June 1992 but was sent back in September 1992. He has been in a disciplinary detention status between May 9, 1991 and June 4, 1992. He was also in a disciplinary detention status between September 22, 1992 and October 1, 1992.[1]

Plaintiff Douglas is indigent. Although he earns $2.30 a day, 20% of his pay is automatically deducted for restitution and an additional 75% is deducted as restitution for an October 1991 incident involving an assault on a correctional officer. Inmate Douglas has had four actions pending at times pertinent to this case. They include three civil rights actions under 42 U.S.C. § 1983 and a post-conviction relief action filed in state district court.

Ernest Douglas experienced difficulty with receiving legal postage upon reaching the $7.50 limit when he returned to Living Unit D, the third floor[2] from the disciplinary detention unit in December 1991. He requested an envelope to write to his attorney regarding a § 1983 action. An unknown official on the third floor Living Unit refused to give him the postage. The court is unable to place a dollar value on any harm suffered by Douglas as a result of the mail policy.

While in disciplinary detention, Douglas was disciplined for misbehavior in the exer-

2. LUD 3 is a living unit that houses inmates in disciplinary detention.

cise pen on several occasions. These instances included situations where he lost the remaining portion of his one-hour exercise period for failing to keep moving at all times in the exercise pen and one situation where he lost four days exercise while waiting to see the adjustment committee on a major disciplinary report for fighting in the exercise pen.

*Scott Olmstead*

Inmate Scott Olmstead has been at the Iowa Men's Reformatory since February 1991. He has been in a disciplinary detention status since April 1991. Accordingly, he has no prison employment. He does not receive money from outsiders. He is indigent. He also has had three civil rights claims under § 1983 pending together with a post-conviction relief action in state court.

Inmate Olmstead is deeply indebted financially to the IMR. On April 10, 1992, Assistant Warden John Sissel informed him that he was $30.78 in debt for postage and copies. *See* Plaintiff's Exhibit 16. On one occasion in 1992, he needed a legal envelope to mail a civil rights case to the court and received it. However, on other occasions when the plaintiff had exceeded the $7.50 limit on indebtedness, he asked Lt. Lewis for postage and was refused because of the $7.50 limit and because plaintiff faced no imminent deadlines or other emergencies. He once requested legal postage from Captain Salviati who did not respond to his kite. Finally, Assistant Warden Sissel replied to a kite and, while it appears that plaintiff did not receive any free postage, arrangements were made for Olmstead to talk with his attorney.[3] On another occasion, when an attorney wrote a letter asking Olmstead to respond to some questions, Lt. Lewis denied free postage as Olmstead had reached the $7.50 limit. At that time, plaintiff was attempting to mail documents necessary to intervene in this case as a plaintiff. Ultimately, plaintiff borrowed an envelope from another inmate (a violation of institutional rules) and mailed the document. The court is unable to place a dollar value on

any harm suffered by Olmstead as a result of the mail policy.

While in detention statuses, Olmstead has lost the remaining portion of his exercise period and the following exercise period on several occasions because he violated the institutional rule that requires inmates to keep moving in disciplinary detention exercise pens. He also received a major report for misbehavior in the exercise pen and was denied exercise between the time of the report and his hearing before the adjustment committee. Part of this period fell on a weekend so plaintiff was deprived of two days of exercise during this four-day period.[4]

*Jeffrey Hershberger*

Inmate Jeffrey Hershberger was an inmate at the IMR for nine years before his release in 1993. He was continuously in a detention status between November 1990 and September 1992. During that time, he had no institutional income but did receive money from friends and family. Hershberger has also had several civil rights cases pending as well as a post-conviction relief action in state court. While exercising, Hershberger frequently lost the remaining portion of his exercise period and the next day's exercise because he violated the institution rule that requires inmates to keep moving in the exercise pen.

Hershberger's account had a negative balance on several occasions while in detention statuses. In the fall of 1992, plaintiff Hershberger complained to Captain Salviati of the 50 cent monthly "service charge." He also grieved this dispute and lost his grievance. Hershberger also broke institutional rules by borrowing envelopes from friends when Lt. Lewis turned down his request for additional envelopes because he had reached the $7.50 debt limit. Hershberger was corresponding with attorneys and a paralegal and was hindered in his ability to conduct legal research by the lack of postage. The court is unable to place a dollar value on any harm suffered by Hershberger as a result of the mail policy.

---

**3.** The record is unclear about how this accommodation was made. Plaintiff simply testified that Assistant Warden Sissel "shoved" his problem on attorney Phil Mears.

**4.** Inmates do not exercise on weekends in disciplinary detention status.

*No Free Legal Postage for Indigent Inmates*

The Iowa Men's Reformatory does not provide free legal postage to indigent inmates. Instead, inmates whose account balances drop below $15 are permitted to borrow funds from the institution for the purpose of purchasing legal postage. However, inmates who have negative account balances are charged 50 cents for every month that the debt remains unpaid.

In addition, there is a presumptive limit to the amount of debt that can be incurred. When an inmate's negative account balance reaches $7.50, the inmate is no longer allowed to charge legal postage at will. The $7.50 legal indebtedness limit is not exceeded without the approval of the assistant warden or his designee. The limit is not exceeded unless circumstances show an "exception need" (Defendants' Exhibit B at 3).

The institution has euphemistically described the 50 cent per month fee as a "service charge." However, no monthly service is associated with this charge. As explained by Nancy Barnes, an accounting clerk at IMR, the 50 cent monthly charge is not posted to the inmate's accounts on a monthly basis. Rather, when an inmate receives funds from institutional work or from outsiders, she simply multiplies the number of months that the account was in a negative balance times 50 cents and deducts the sum from the funds acquired by the debtor inmate. No charge is made against inmates without indebtedness despite the fact that the same examination is made concerning their finances.

In determining whether to extend credit beyond the $7.50 limit, institution officials' discretion remains almost completely without standards. The best definition of exceptional need that one can gather from the believable evidence in this record is that an inmate, to exceed the $7.50 credit limit, must show an

imminent court deadline.[5] Ordinarily, a desire to file a new lawsuit or a desire to correspond with an attorney in an attempt to retain that person is not an exceptional need. It was obvious from the examination of institutional officials, that little thought had been given to the myriad of circumstances for which an inmate should be entitled to access to legal postage that do not fall within the definition of exceptional need set forth above.[6]

The defendants presented evidence to the effect that inmates are permitted to have attorneys send self-addressed stamped envelopes to the inmate for their use. Further, attorneys can send money to inmates that can be used to purchase postage. Finally, inmates without funds to purchase a 29 cent postage stamp can make collect calls[7] to any attorney or the court. The inadequacy of these alternatives is self-evident. However, even if an inmate were so lucky as to secure an attorney without paying for his or her services, and even if that inmate were so persuasive as to get the attorney to send money to the inmate, the institution would then deduct 20% of that money as part of a restitution program.

The postage regulation denying free legal postage was adopted in 1989. Prior to that, inmates received five free franked envelopes per week that could be used for any purpose. It was in this context that an agreement was reached in *Holtz v. Farrier*, C80–0088 (N.D.Iowa, Sept. 16, 1981). That agreement provides, in pertinent part:

> All residents shall be provided with paper and carbon paper for correspondence with attorneys, courts, clerk or court, governmental officials and governmental agencies. Postage and envelopes for legal mail shall be available to all inmates. Inmates with funds in their accounts may be charged for postage and envelopes. Indi-

**5.** See Plaintiffs' Exhibit 16 in which Assistant Warden Sissel defined it as an "emergency need."

**6.** The court does not believe that the term "exceptional need" has been liberally interpreted in favor of the inmate. There was testimony that institution officials simply take the inmate at his word when he states that he has an imminent

need for legal correspondence. This testimony is inconsistent with the more believable testimony showing that inmates are required to demonstrate an imminent need by producing documentation which demonstrates it.

**7.** Legal telephone calls from detention statuses are severely limited by the institution.

gent inmates shall be provided such envelopes and postage free of charge although they may be charged for items so provided when they have funds in their account. Inmates whose accounts would be reduced to less than fifteen dollars ($15.00) by paying for envelopes and postage for legal mail may request to have such charges for a reasonable amount of legal mail deferred until their next institutional pay check or until their account has $15.00 in it. There shall be a charge not to exceed 50 cents per month for deferral of such charges. Defendants' Exhibit G at 6. In 1989, the institution chose to quit giving free postage but retained the policy of charging inmates 50 cents per month for having incurred debt.

Accordingly, the defendants point to this provision of the *Holtz* settlement agreement as though they are absolutely entitled to deduct 50 cents per month from an inmate's account indefinitely because he borrowed 29 cents from the institution to mail a complaint for which the United States Constitution guarantees a right to file and mail at no expense. To say nothing about the wildly exorbitant interest rate [8] that is thereby created on a debt to the institution, this requirement has the added effect of directly chilling First Amendment rights that are well established and well known to prison officials.

*Exercise in Detention Status*

In November 1990, there was a series of fights and assaults in disciplinary detention exercise pens that caused Warden Thalacker, Assistant Warden John Sissel, and Security Director Russell Behrends to change the policies concerning exercise in disciplinary detention status. Specifically, this ad hoc committee determined that inmates who desired to get out of their cell for exercise should in fact exercise. Accordingly, since November 1990, inmates exercising in the disciplinary detention exercise pens must constantly remain in forward motion. That is, they must walk during the entire one-hour exercise period. Inmates who stop walking, even momentarily, are taken from the exercise pen back to their cell. They lose the remainder of that exercise period and also lose their next exercise period as well.

An inmate who gets written up for a major disciplinary report occurring in the exercise pens usually loses all of his exercise until such time as he sees the adjustment committee, typically four days after the incident. However, the determination as to whether an inmate with a disciplinary report loses his exercise until he sees the adjustment committee is left to the discretion of the unit supervisor.

Inmates in detention statuses have lost most of the privileges that they enjoy in general population. They are locked in their cell except as necessary for exercise, showers, and other special events such as legal visits. They lose most of their personal property including their legal materials. There is very little left to take away from prisoners who misbehave in disciplinary detention with the exception of good time credits and the imposition of more disciplinary detention time.

Institution officials believe that more than just the rest of one exercise period should be taken away from the inmate in order to gain compliance with this rule that requires inmates to keep moving. Otherwise, inmates could manipulate the length of their exercise period by simply stopping when they wanted to be taken in. This results in a need for additional correctional officer escorts at unscheduled intervals that the prison has legitimate interest in attempting to avoid. In addition, the next exercise period is taken so that inmates who violate the rule in the last couple of minutes have some consequence that is immediately attached to this policy.

It is very difficult for prison officials to measure whether this rule change has been successful in reducing the number of assaults in the exercise pens. The rule was adopted to reduce the number of instances in which inmates can engage in "nose to nose" confrontations. It also, to a lesser extent, keeps the inmate occupied while he is in the exer-

---

8. A conservative demonstration of this exorbitance can be shown as follows: An inmate who is $7.50 "in the red" for a period of one year will be charged $6.00 for the privilege of borrowing $7.50. In inmate whose account is 29 cents in the red for one year will also be charged $6.00 for the privilege of borrowing 29 cents.

cise pens. Pursuant to this rule, the guards do not have to wait until two inmates are physically striking each other before they are separated. Once the inmate stops, he is subject to having his exercise terminated for that day and the next exercise period also.

## CONCLUSIONS OF LAW

### A. Legal Mail and Access to the Courts

It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. *Bounds v. Smith,* 430 U.S. 817, 824–25, 97 S.Ct. 1491, 1496–97, 52 L.Ed.2d 72 (1977). In *Bounds,* the United States Supreme Court also held that reasonable restrictions could be placed upon the right of access to the courts.

> This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial....

*Id.* (Citations omitted); *see also Grady v. Wilken,* 735 F.2d 303, 305 (8th Cir.1984) ("Access to the courts and use of the mails are not absolute rights, and the Supreme Court has subjected restrictions on these rights to balancing tests.").

To assert a successful claim for denial of meaningful access to the courts, an inmate must ordinarily demonstrate that he has suffered prejudice or actual injury as a result of the prison officials' conduct. *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir.1993); *Berdella v. Delo,* 972 F.2d 204, 210 (8th Cir. 1992); *Flittie v. Solem,* 827 F.2d 276, 280 (8th Cir.1987); *Grady v. Wilken,* 735 F.2d 303, 305–06 (8th Cir.1984). However, Courts of Appeals from other circuits have held that where the deprivation is "systemic, embracing the basic adequacy of materials and legal assistance made available to all ... of the prison population," an inmate need not show actual injury to state a proper claim. *Chandler v. Baird,* 926 F.2d 1057, 1063 (11th Cir.1991). In these cases, the deprivation is so fundamental that it constitutes "an injury in and of itself." *Sowell v. Vose,* 941 F.2d 32,

34 (1st Cir.1991) (deprivation of law libraries or legal assistance does not require actual injury); *Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989) (same).

The Eighth Circuit Court of Appeals has already concluded that certain restrictions on legal mail are reasonable. A prison's policy of refusing to pay postage for legal mail when an inmate simultaneously pays his own postage for personal letters does not unreasonably restrict an inmate's access to the courts. *Glick v. Lockhart,* 769 F.2d 471, 472 (8th Cir.1985). In *Smith v. Erickson,* 884 F.2d 1108, 1111 (8th Cir.1989) (*Smith I*), the Eighth Circuit Court of Appeals concluded that the district court erred in dismissing a claim that a similar postage policy was facially unconstitutional. In a subsequent ruling, the Eighth Circuit Court of Appeals found that one free mailing per week for legal correspondence met constitutional requirements when an inmate who needs additional financial assistance for mailing legal correspondence is allowed to maintain a negative balance in his account indefinitely. *Smith v. Erickson,* 961 F.2d 1387, 1388 (8th Cir.1992) (*Smith II*).

These cases show that the IMR may legitimately require inmates who pay for personal correspondence to pay for legal mail. *Glick v. Lockhart,* 769 F.2d 471, 472 (8th Cir.1985). However, the IMR must provide indigent inmates at least some free postage for legal mail and allow inmates to maintain a negative balance in their accounts indefinitely for additional legal postage. *Smith II, supra,* at 1388.

Defendants contend that plaintiffs have shown no prejudice, which they define as failure to meet court-ordered deadlines, as the result of the current policy, and therefore contend that there has been no denial of meaningful access to the courts. *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir.1993); *Berdella v. Delo,* 972 F.2d 204, 210 (8th Cir.1992); *Flittie v. Solem,* 827 F.2d 276, 280 (8th Cir.1987); *Grady v. Wilken,* 735 F.2d 303, 305–06 (8th Cir.1984). The court, however, concludes that the denial of some minimum number of free stamped envelopes to indigent inmates is "systemic, embracing the basic adequacy of materials and legal assis-

tance made available to all ... of the prison population," *Chandler v. Baird*, 926 F.2d 1057, 1063 (11th Cir.1991), and a deprivation so fundamental that it constitutes "an injury in and of itself," such that these inmates need not show actual injury to state a proper claim. *Sowell v. Vose*, 941 F.2d 32, 34 (1st Cir.1991); *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989).

Defendants offer two prior decisions as controlling in the present case. First, defendants cite the unpublished decision in *Risdal v. Piper*, Civil No. 90–CV–70354, (S.D.Iowa, December 29, 1992), which upheld a similar overdraft policy at the Iowa State Penitentiary (ISP). The court concludes that *Risdal* is distinguishable. Inmates at ISP who are not working receive $7.50 per month in "idle pay." Inmates at IMR who are not working receive no money. Furthermore, the claimants in *Risdal* received money from outside sources.

The defendants also point to provisions of the *Holtz v. Farrier*, C80–0088 (N.D.Iowa, Sept. 16, 1981), court-approved settlement agreement as though they are absolutely entitled to deduct 50 cents per month from an inmate's account indefinitely because he borrowed 29 cents from the institution to mail a complaint for which the United States Constitution guarantees a right to file and mail at no expense. Here, there has been a significant change from the factual circumstances surrounding the *Holtz* settlement agreement. When the *Holtz* agreement was entered in 1981, until sometime in 1989, all inmates at the IMR received five free stamped envelopes per week to use for any purpose. Inmates could reasonably expect to conduct their legal business with the five free stamped envelopes without incurring overdrafts except in exceptional circumstances. Inmates currently receive no free stamped envelopes. An indigent inmate will now find it almost impossible to avoid the "service charge" if he wants to mail a legal letter.

Finally, defendants argue that they are entitled to qualified immunity because they acted in reasonable reliance on the *Holtz* settlement agreement. The court must make a three-part inquiry to determine whether the defendants are entitled to qualified immunity: First, it must determine whether the prisoner has asserted a violation of a constitutional right; second, whether the allegedly violated constitutional right was clearly established; and third, if, given the facts of the case, a reasonable official would have known that the alleged actions violated that right. *Foulks v. Cole County, Mo.*, 991 F.2d 454, 456 (8th Cir.1993); *Cross v. City of Des Moines*, 965 F.2d 629, 631–32 (8th Cir. 1992). The right of access to the courts including free postage for legal mail has been clearly established since the decision of the Supreme Court in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) and the record demonstrates that the claimants have clearly established a violation of that right by the IMR overdraft and "service charge" policy. The court concludes that a reasonable official would have known that the *Holtz* settlement agreement did not overrule prior Supreme Court and subsequent Eighth Circuit decisions. Further, the context in which *Holtz* was negotiated has been unilaterally changed by the defendants herein. Defendants are not entitled to qualified immunity.

■ Courts have broad discretionary power to order injunctive relief. *Burton v. Armontrout*, 975 F.2d 543, 544 (8th Cir.1992). An injunction must be tailored to remedy the specific harm shown. *Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir.1992). The court therefore concludes that the policy of denying free postage to indigent inmates for legal purposes is unconstitutional and is hereby enjoined. Similarly, the current practice of charging inmates 50 cents per month for having a negative balance in their account is enjoined. The policy of forbidding inmates to exceed $7.50 indebtedness for legal postage is also unconstitutional as applied and is also enjoined. In accord with *Smith v. Erickson*, 961 F.2d 1387, 1388 (8th Cir.1992) (*Smith II*), defendants are ordered to provide each indigent inmate weekly with at least one free stamped envelope, or such other larger number of free stamped envelopes as is deemed appropriate by prison officials, for use for legal mail.

**1478**

■ The court has not found or been directed to any authority that requires prison officials to provide free postage to prisoners for personal correspondence. On the contrary, the Eighth Circuit Court of Appeals has held that the state need not provide postage for indigents' nonlegal mail. *Kaestel v. Lockhart,* 746 F.2d 1323, 1325 (8th Cir. 1984). The court therefore concludes that judgment in favor of defendants should be entered on plaintiffs' claims that the postage regulations at the institution deny rights of familial privacy.

### B. Exercise Pen Regulations

■ Plaintiffs also contend that they were denied due process of law because their exercise periods were terminated and they lost the following days' exercise if they stopped moving forward during exercise periods. Denial of recreation for a short period, per se, is not a constitutional violation. *See Knight v. Armontrout,* 878 F.2d 1093, 1096 (8th Cir.1989) (no recreation for thirteen days does not constitute cruel and unusual punishment); *Rust v. Grammer,* 858 F.2d 411, 414 (8th Cir.1988) (suspension of yard privileges for thirteen days during lockdown does not violate eighth amendment); *Leonard v. Norris,* 797 F.2d 683, 685 (8th Cir.1986) (no out-of-cell exercise for fifteen days in punitive confinement not unconstitutional). It is "obduracy and wantonness" and conduct which involves more than ordinary lack of due care for a prisoner's interest or safety that characterizes conduct prohibited by the cruel and unusual punishment clause. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *Knight v. Armontrout,* 878 F.2d 1093, 1096 (8th Cir.1989).

■ Furthermore, a prison security measure undertaken to control disturbances does not rise to the level of an eighth amendment violation unless officials acted "in bad faith and for no legitimate purpose." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). The relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The courts accord prison officials great deference and will not substitute their own judgment for that of prison authorities concerning the reasonableness of the alternative chosen to control a disruptive situation. *Rust v. Grammer,* 858 F.2d 411, 414 (8th Cir.1988); *See also Goff v. Menke,* 672 F.2d 702, 705 (8th Cir.1982) (control of the administrative details of state prisons lies exclusively in the hands of state officials). The court concludes that the exercise pen rules requiring prisoners to move forward continuously were enacted for the valid penological purpose of preventing assaults in the exercise pens and were reasonably related to that purpose.

■ Similarly, the court finds that plaintiffs' due process rights have not been violated. Where regulations contain "particularized substantive standards or criteria to guide the exercise of discretion by penitentiary officials," and contain language of a mandatory nature, e.g., shall, will, must, a liberty interest is created which cannot be taken away without due process. *Knight v. Armontrout,* 878 F.2d 1093, 1095 (8th Cir. 1989) (citing *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983), and *Clark v. Brewer,* 776 F.2d 226, 230 (8th Cir.1985)). Even assuming that the IMR regulations concerning exercise and withdrawal of exercise privileges created a liberty interest, those regulations are inapplicable where prison officials imposed the denial of exercise privileges to regain control of a disruptive situation that was threatening prison security and the well-being of the inmates, and not as a punitive measure directed at particular inmates. *Rust v. Grammer,* 858 F.2d 411, 413 (8th Cir.1988). The court concludes that IMR policy of terminating the exercise of inmates who do not move forward continuously in the exercise pen and denying them the next day's exercise without prior hearing does not violate due process. Judgment should be entered in favor of defendants on plaintiffs' claims for denial of due process and of cruel and unusual punishment for termination of exercise when prisoners cease moving forward continuously in the exercise pens.

Upon the foregoing,

IT IS ORDERED

1. The court finds in favor of plaintiffs Douglas and Olmstead on their claim of denial of meaningful access to the courts as a result of the IMR policy on legal mail. Defendant John Thalacker is enjoined from (1) denying free postage to indigent inmates for legal purposes, (2) charging inmates 50 cents per month for having a negative balance in their account as the result of purchasing legal postage, (3) forbidding inmates to exceed $7.50 total indebtedness for legal postage under the present standard called "exceptional need."

2. Defendant John Thalacker is ordered to provide indigent inmates weekly with at least one free stamped envelope, or such other larger number of free stamped envelopes as is deemed appropriate by prison officials, for use for legal mail.

3. The court finds in favor of defendants on plaintiffs' claim of denial of rights of familial privacy as a result of the IMR policy on personal mail.

4. The court finds in favor of defendants on plaintiffs' claims of violation of their Eighth or Fourteenth Amendment rights as a result of the IMR exercise yard policy.

5. The clerk shall enter judgment in favor of plaintiffs Douglas and Olmstead and against defendant Thalacker in his official capacity as warden of the IMR on the claim noted in paragraphs 1 and 2 above. The clerk shall enter judgment in favor of the defendants on all other claims by plaintiffs Douglas and Olmstead and in favor of all defendants against all claims of all other plaintiffs.