# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4184

_____

| | | |
|---|---|---|
| Harold Lowell Curry; Patricia Lynn Spitzack-Havlish, individually, and as co-trustees for the heirs of Edwin Hugh Curry, | * * * * * | |
| Plaintiffs - Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| David Crist, individually and in his official capacity as Warden of the Stillwater Correctional Facility, | * * * * | |
| Defendant - Appellee. | * | |

_____

Submitted:  June 16, 2000

Filed:   September 28, 2000

_____

Before LOKEN, ROSS, and HANSEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

On November 27, 1997, Minnesota inmate Edwin Curry was brutally murdered at the Stillwater Correctional Facility by fellow inmate Craig Bjork.  Curry's heirs filed this § 1983 action against Warden David Crist and other prison officials, alleging that they violated Curry's Eighth Amendment rights by failing to protect him from the fatal

assault. Curry's heirs appeal the district court's[1] decision to grant Crist summary judgment based on qualified immunity. We affirm.

## I. Background.

In 1982, Bjork murdered his two sons, his girlfriend, and a prostitute. He was sentenced by a Minnesota court to three consecutive life sentences for first degree murder and a consecutive 242-month sentence for second degree murder. During the 1980s, Bjork was a difficult inmate, and other inmates harassed him for being a child killer. The Minnesota Department of Corrections eventually transferred him to the Montana prison system, from which he tried to escape. He was returned to Minnesota in 1989 and spent five years at the maximum security facility in Oak Park Heights. Bjork received above average work evaluations and no disciplinary reports in 1991, 1992, and 1993 and was transferred in 1994 to Stillwater, a "close custody" facility. He received three or four disciplinary reports and segregation sentences in 1994 and 1995 for disorderly conduct, disobeying orders, and substance abuse.

In May 1996, Bjork was sentenced to seventy-five days in segregation for threatening to throw hot water on two correction officers. On July 14, 1996, while in segregation, Bjork sent a kite (memorandum) to Warden Crist stating that "Stillwater is not a healthy environment for me." Bjork described himself as "homicidal" and depressed, and concluded:

> I'm very close to committing mass murder in Stillwater. Trust me minimum of 3 bodies, I'd go for 10 & come real close. So how do we handle this? (I'm for real) I'd like to work it out. But you can blow me off.

---

[1]The HONORABLE ANN D. MONTGOMERY, United States District Judge for the District of Minnesota.

Crist immediately referred the threatening kite for investigation. Case Manager Debra Nelson interviewed Bjork. She reported he appeared capable of following through on his threat and requested a psychological evaluation. On July 30, Nelson issued a formal Notice of Violation for Threatening Others, which prevented Bjork's release from segregation. A staff psychologist interviewed Bjork on August 1. Bjork denied threatening anyone, said "he was merely trying to get people to take him seriously," but also "indicated that some officers might get hurt because of their attitude." A few days later, Bjork wrote Crist a lengthy kite explaining that his July 14 kite was "an emotional release & cry for help," not a threat; complaining that further segregation was unnecessary and he had not been properly charged; and concluding, "I really want to stay at [Stillwater] . . . so let me show you how I want to do my time quiet & easy." Warden Crist responded in writing that the Threatening Others charge was deserved but would be withdrawn because of undue delay in bringing it. Bjork was then released to the general prison population. In January 1997, Bjork was assigned to work in the prison kitchen with Curry. He was also transferred to Cell Hall D, a "service unit" where inmates receive additional privileges and amenities.

In October 1997, at his request, Bjork was transferred to a new tier in Cell Hall D. Soon after, he asked to move again, complaining that other inmates controlled use of the telephone on his new tier. On November 12, Bjork sent a letter to Crist complaining of the telephone situation. The complaint was investigated, and two inmates who were improperly controlling use of the phone were transferred to another tier. However, Bjork's request for a transfer was denied because of concern he was manipulating the situation to effect an unwarranted second transfer. When Crist spoke to Bjork briefly on November 21, Crist did not perceive that Bjork was distressed or noticeably angry with prison staff or other inmates. Unit Director Tim Lanz spoke to Bjork about the telephone situation on November 26 and did not perceive that he was distressed or agitated or felt he was being treated unfairly. Lanz was "extremely shocked" when Bjork murdered Curry the next day with a stolen plumber's pipe.

Bjork consented to an investigative interview the day after the attack. He admitted killing Curry in their basement work area during a one-half hour period between guard patrols. Bjork said he had no reason to kill Curry other than the fact that Curry was the nearest available victim. Bjork said he had planned to leave the kitchen area and kill other inmates and staff that day, but he was discovered hosing down the murder area by a patrolling guard. Bjork fled but was quickly captured.

## II. Discussion.

Qualified immunity protects government officials performing discretionary functions from liability for damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates. See Farmer v. Brennan, 511 U.S. 825, 833 (1994). A prison official violates this right when "he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997). A failure-to-protect claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk. See Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998).

Although the failure-to-protect cause of action has a subjective component, the critical inquiry for qualified immunity purposes is whether it was "objectively legally reasonable" for the prison official to believe that his conduct did not violate the inmate's clearly established Eighth Amendment right. Anderson v. Creighton, 483 U.S. 635, 641 (1987). Consistent with that standard, the Supreme Court observed in Farmer v. Brennan that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844. Qualified

immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

In this case, the district court granted Crist qualified immunity on two grounds: "the record does not support an inference that Curry was under a substantial risk of harm at the time he was attacked," and "the record does not raise a factual question suggesting that [Crist] knew of such a risk and deliberately disregarded it." We review the district court's qualified immunity decision *de novo*. See Jackson, 140 F.3d at 1151. Because we are reviewing the grant of summary judgment, we view the facts most favorably to Curry's heirs, the nonmoving parties. See Prater v. Dahm, 89 F.3d 538, 539 (8th Cir. 1996). In this case, the facts are for the most part undisputed.

Curry's heirs argue that "[a] reasonable prison official would not have allowed Bjork, a five-time murderer and known psychopath who had repeatedly threatened to commit mass murder at [Stillwater], to work alone with another inmate in an unsupervised and unobservable area of the prison with access to weapons." In essence, they contend that Bjork should not have been given any prison job. Instead, he should have been locked away in segregation or a maximum security facility at the time he murdered Curry. Curry's heirs cite three distinct factual bases for this contention.

First, Curry's heirs stress the multiple murders that led to Bjork's lifetime incarceration, and his violent threats and behavior during his early years in prison in the 1980s.[2] But prison officials are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence. Based upon their general observation that inmates serving life sentences tend to avoid trouble, and their specific observation of Bjork's nonviolent conduct in the years following his return

---

[2]For example, a March 1984 Notice of Violation reported that Bjork had threatened to kill a prison officer and commented, "What can they do give me more time," no doubt a reference to Minnesota's lack of the death penalty.

from Montana, Stillwater officials made the decision to reward Bjork with work assignments and ultimately a transfer to Cell Hall D. They did not thereby violate the Eighth Amendment rights of all inmates in the general population with whom Bjork might come in contact.

Second, the Curry heirs argue that Crist was deliberately indifferent to a substantial risk of harm when he failed to segregate Bjork, or to return Bjork to the maximum security facility in Oak Park Heights, after receiving Bjork's July 1996 kite threatening to commit mass murder at Stillwater. But Crist immediately responded to that threatening communication, having Bjork interviewed by Case Manager Nelson, who charged Bjork with a disciplinary violation, and by a prison psychologist. Crist ultimately withdrew the charge and released Bjork to the general inmate population, but only after Bjork recanted his threats and objected to further segregation, and after Crist and the other investigators concluded that Bjork's threatening kite was a successful cry for attention by a manipulative, but nonviolent, inmate. Although Bjork's July 1996 threat did appear to create a substantial risk of harm, Crist's conduct after he received the threatening kite was an objectively reasonable response to the perceptible risk to prison staff and other inmates. Moreover, sixteen months then passed before Bjork's fatal assault on Curry. During that period, Bjork made no further threats and was not disciplined for any reason. Crist was not objectively unreasonable in failing to perceive in November 1997 a substantial risk of harm arising from Bjork's recanted July 1996 threats. Curry's heirs counter that Bjork would not have been working with Curry in the Stillwater kitchen in November 1997 had the charge not been withdrawn in August 1996. But as the withdrawn charge carried a penalty of only up to 120 days segregation, that argument is sheer speculation.

Third, Curry's heirs argue that Crist was deliberately indifferent to the substantial risk of harm created when Bjork complained about phone usage in October 1997 and asked staff to transfer him within Cell Hall D. Again, Crist and prison staff reacted promptly to Bjork's complaint, investigating the telephone issue and

transferring two inmates who were improperly controlling use of the telephone in Bjork's tier. When Bjork complained further about staff's refusal to transfer him, Crist spoke briefly with Bjork on November 21, and Lanz met with Bjork on November 26. Bjork did not threaten prison staff or other inmates in any of these communications. Thus, it was objectively reasonable that Crist (and other prison staff) did not perceive this incident as creating a substantial risk of harm to other inmates.

We have held in a number of cases that prison officials are entitled to qualified immunity from § 1983 damage actions premised on an Eighth Amendment failure-to-protect theory when an inmate was injured in a surprise attack by another inmate. See Jackson, 140 F.3d at 1152; Prosser v. Ross, 70 F.3d 1005, 1007 (8th Cir. 1995); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990); see also Falls v. Nesbitt, 966 F.2d 375, 378-79 (8th Cir. 1992) (judgment for plaintiff on the merits reversed). In this case, unlike Reece v. Groose, 60 F.3d 487 (8th Cir. 1995), where the assaulted inmate was a known "snitch," there is no evidence that Curry was a likely target of inmate violence, or that Bjork harbored any animosity toward Curry. In late November 1997, it was not objectively unreasonable for Crist and other officials to fail to detect that Bjork's anger at prison staff for refusing a transfer request would unleash the long-dormant psychopathic demon lurking beneath his nonviolent exterior. Bjork's decision to murder a fellow inmate came without warning, and his selection of Curry as the victim was a tragic fortuity. In these circumstances, the district court correctly concluded that Crist is entitled to summary judgment on qualified immunity grounds.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-7-