David Arlan BAILEY, Appellee,

v.

Frank WOOD, Appellant,

John Doe.

No. 89–5211.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1990.

Decided July 31, 1990.

Richard L. Varco, Jr., St. Paul, Minn., for appellant.

Gary M. Hird, Burnsville, Minn., for appellee.

Before LAY, Chief Judge, BOWMAN, Circuit Judge, and STUART,* Senior District Judge.

LAY, Chief Judge.

This case is one of an increasing number involving an assault by one prisoner on another in a state prison. It occurred on October 14, 1984, in the Minnesota Correctional Facility at Oak Park Heights (OPH). David A. Bailey, a state prisoner, received

---

* The HONORABLE WILLIAM C. STUART, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

13–15 stab wounds from the hands of another felon Terry McClain. Bailey filed suit in federal district court under 42 U.S.C. § 1983 of the Civil Rights Act, alleging that the Warden, Frank Wood, had subjected him to cruel and unusual punishment under the Eighth Amendment of the United States Constitution by failing to take proper security measures to protect him from the assault.

■ A trial was held before the Honorable James M. Rosenbaum.[1] 708 F.Supp. 249. A jury returned a verdict against Warden Wood for $26,750 in compensatory damages and $28,600 in punitive damages. The court also awarded Bailey's attorney $32,390 in attorney fees. The State of Minnesota representing Wood has appealed the verdict on several grounds. We need only address the sufficiency of evidence. We find that the evidence failed to show that Warden Wood acted with deliberate indifference or in reckless disregard of Bailey's rights so as to provide relief for Bailey under the Constitution. We therefore reverse and remand to the district court with directions to vacate the judgment.[2]

## BACKGROUND

The correctional facility at Oak Park Heights is a maximum security prison designed to house the most dangerous and violent inmates along with those inmates with a history of escapes or escape attempts. OPH has eight complexes, each capable of housing a maximum of 52 inmates. Each complex is divided into eight defendable living units (DLU) and each DLU is divided into six or seven cells. The complexes are separated so that inmates do not have access to other complexes. Access to each cell is limited to only those inmates who live in the DLU in which the cell is contained. OPH also has a segregation unit, which is an isolation area separated from the other complexes and used to house inmates who are incompatible or have violated prison rules.

Bailey was originally convicted of aggravated robbery and ordered to serve his sentence at the Minnesota Correctional Facility at Stillwater. In January of 1983, Bailey was transferred to OPH following an escape attempt. At the time of his transfer, Bailey was not identified as having any incompatibility problems with other OPH inmates and was placed in a cell next to Terry McClain. On June 16, 1983, Bailey was observed by the OPH staff as having a black eye, and some swelling around his nose and upper lip. Bailey refused to identify his attacker and told his caseworker that he was not having problems with anyone in his DLU. He eventually signed a waiver of protective custody.

Even though Bailey refused to identify his assailant the staff members at OPH suspected it was Terry McClain. McClain was serving a life sentence for first degree murder and aggravated robbery. After Bailey was admitted to OPH McClain began making homosexual advances towards him which Bailey rejected. Undeterred, McClain became more and more insistent and eventually began threatening Bailey. Testimony of the staff revealed that they were aware of the advances made by McClain towards Bailey and in written incident reports forwarded to Warden Wood they speculated that it was McClain who

---

1. United States District Judge for the District of Minnesota.

2. This is an unfortunate case. McClain brutally assaulted Bailey with a knife—a "shank"—a homemade weapon which McClain had somehow come to possess on or before the day of the assault. McClain has been separately prosecuted for the assault. No action was brought against the guard who had left his post and allowed McClain to wrongfully enter into the area where Bailey lived. The guard's absence resulted in the negligent failure to "pat down" McClain and to prevent the occurrence. The guard was clearly negligent and may have manifested a reckless indifference towards Bailey's safety. However, he was not joined as a defendant and liability cannot be imputed to Warden Wood, who maintained overall supervision of the prison, under principles of agency and the doctrine of *respondeat superior*. This is well settled law under section 1983 and is based upon principles governing constitutional claims under the Civil Rights Act. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978).

had caused Bailey's injuries. Bailey testified at trial that it was McClain who attacked him on the night of June 15, 1983.

Four days after Bailey's black eye incident, McClain was found with a knife in his shoe and transferred to complex 5, the segregation unit. Upon his release from segregation, McClain was transferred to complex 3. In January of 1984 he requested to be transferred to Bailey's complex. In considering this request the staff asked Bailey if he would object to McClain being transferred to his complex. Bailey responded that he would not object to that. While this particular request was denied, after additional requests, McClain was eventually transferred to Bailey's complex in July of 1984. After returning to Bailey's complex, McClain's request to be transferred to Bailey's DLU was denied.

On September 28, 1984, McClain and Bailey were involved in a fight referred to as the "broom incident." Staff members separated the two men after finding Bailey fending off McClain with a broom. Neither man was seriously injured. After the fight, Bailey told three OPH staff members that he believed McClain would kill him if given the chance. On October 13, 1984, McClain was released from segregation and placed in a complex at the opposite end of OPH from the complex Bailey was living in.

On October 14, 1984, both McClain and Bailey's complexes were released to the prison yard for an exercise period. Bailey was told of the joint exercise period by Richard Bol, a staff member working in Bailey's complex, and that McClain would be in the yard at this time. Bol recommended to Bailey that he remain inside the complex during the exercise period, which Bailey did. During the exercise period McClain acquired access to Bailey's complex through a "143 door" which was supposed to be locked with a guard present to pat search anyone attempting to enter. On this day it was not locked and no guard was present. After entering the complex, McClain went to Bailey's DLU, entered his cell and stabbed Bailey 13–15 times.

After the stabbing Bailey was transferred to the Stillwater correctional facility. He then filed this lawsuit, alleging he had been subjected to cruel and unusual punishment and had been deprived of his liberty interest in personal security.

DISCUSSION

■ In order to show an eighth amendment· violation, Bailey must show that Warden Wood was deliberately indifferent to his right to be free from violent attacks by other inmates. *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984) (quoting *Branchcomb v. Brewer*, 669 F.2d 1297, 1298, *appeal after remand*, 683 F.2d 251 (8th Cir.1982)). This may be established by proving that Warden Wood intentionally deprived Bailey of his rights or by showing that he acted in reckless disregard of those rights. *Id.* Here, there is no evidence, and Bailey does not allege, that Warden Wood acted intentionally to deprive him of his right to be free of attack.

■ To establish that Warden Wood acted in reckless disregard of his rights, Bailey must show that he was faced with a pervasive risk of harm and that Warden Wood failed to reasonably respond to that risk. *Porm v. White*, 762 F.2d 635, 637 (8th Cir.1985). As the district court instructed the jurors, "[a] pervasive risk of harm exists when violent assaults occur with sufficient frequency that the plaintiff is put in reasonable fear of his safety, and prisoner [sic] officials * * * should be reasonably apprised of the need for protective measures." Tr. p. 776; *see also Martin*, 742 F.2d at 474.

■ The Warden admits he reviewed the incident reports containing the staff's speculation that the injuries Bailey sustained on June 15, 1983, were caused by an altercation with McClain. The Warden also admits reviewing the incident reports documenting the broom incident of September 28, 1984, which identified McClain as the aggressor and that he was in an unauthorized area. Further, Warden Wood received a memo from one of his staff members stating that McClain at times had been discovered carrying a concealed weapon. Warden Wood also knew that McClain was

incarcerated for first degree murder and that McClain's disciplinary record included two weapon violations and a violation for being in an unauthorized area.

Assuming, without deciding, that the jury was reasonable in concluding that Warden Wood knew that Bailey faced a pervasive risk of harm, we must conclude there was insufficient evidence to . show that Warden Wood failed to respond reasonably to the threat with which Bailey was faced. Bailey argues that once the Warden became aware of the problems he was having with McClain, the Warden could have placed additional guards on his complex, or stationed one next to his door. Bailey also suggests that Warden Wood could have offered him protective custody or put himself or McClain in administrative segregation. Finally, he argues that the Warden could have transferred him to Stillwater. While it is true that these are all things the Warden had the authority to do, in our judgment these arguments exalt hindsight over foreseeability.

In responding to this risk, the Warden knew Bailey and McClain were in separate complexes and believed this would prevent McClain from gaining access to Bailey. He further reasonably believed that the 143 door would prevent access even when the complexes were sharing joint exercise periods. He had no forewarning that the guard would leave his post and allow the 143 door to be unprotected without a guard present to pat search prisoners attempting to use the door. He relied on his staff to inform him of unstable situations and to handle those situations accordingly. It is fundamental that "[p]rison administrators * * * should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *see also Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). OPH is a high security prison which is intended to house the most dangerous inmates. Violence is not condoned and is prevented as much as possible

but it does occur. While Warden Wood may have been negligent in not investigating this situation more fully, the evidence does not reasonably support a conclusion that the Warden exercised a callous disregard or reckless indifference in responding to the risk with which Bailey was faced. *See Porm*, 762 F.2d at 638 (affirming directed verdict in favor of prison officials because evidence failed to show they had any knowledge of specific threats made to the plaintiff inmate himself); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985) (affirming dismissal of section 1983 action against the state commissioner and prison superintendent because evidence failed to show any personal knowledge or involvement in actions of line officers).

## CONCLUSION

If the present law suit had been brought in state court, under the facts presented it is possible that Warden Wood could have been held liable for negligence under a theory of *respondeat superior*. However, a pendant state claim for negligence was not brought in federal court. Thus, plaintiff by choice of forum and choice of claim has asserted a constitutional claim requiring a much higher degree of proof for liability and for damage. As we stated in *Wade v. Haynes*, 663 F.2d 778 (8th Cir. 1981), *aff'd sub nom. Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the "defendant's action must have been more than negligent, his conduct must have been such that it was done with callous disregard of plaintiff's right not to be punished in an inhumane and base way." *Id.* at 782.

In many instances, prison conditions are deplorable. Many in society feel that since the prisoner has committed a crime he deserves little consideration for the environment into which he is placed. Unfortunately, this societal attitude is reflected in state legislatures' similar lack of concern toward prison conditions. Nonetheless the law requires only that a convicted felon be segregated from society for definite terms of months or years. He is not to be imprisoned to receive further punishment not pre-

scribed by his sentence. Although prisons will never be nice places to live the state has a public responsibility to make certain that a prisoner's personal safety remains safeguarded. The state has failed in that responsibility here.

In cases such as this compensation often cannot measure the harm done. *Cf. Vosburg v. Solem*, 845 F.2d 763, 768 n. 5 (8th Cir.1988) (repeated homosexual rape of 19 year old); *Wade*, 663 F.2d at 780–81 (homosexual rape of 18 year old). Compensation can, however, serve as a deterrent to the state to make their prisons more humane. Yet the state itself is immune from liability under the 11th amendment in the federal forum. Similarly under section 1983, liability can only be predicated for egregious wrongs by the *wrongdoer*.

In sum, the compensation of prisoners for harms received in prison is better regulated in state courts through ordinary tort actions. The burden of proof on the plaintiff is much less and the liability of the state can be placed on the supervisory correctional officers through principles of agency. When this occurs, state officials may begin to recognize the dire need to make prisons more humane and less dangerous to inmates who are often, like Bailey, tragic victims of the system.

The judgment of the district court is reversed and the case remanded with directions to enter judgment in favor of Warden Wood.