Charles W. ANDREWS, Appellant,

v.

LeRoy SIEGEL, Tom Dowdle, Robert Erickson, John Twohig, and State of Minnesota, Appellees.

No. 90–5242–MN.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1990.

Decided April 10, 1991.

Randy V. Thompson, Minneapolis, Minn., for appellant.

M. Jadqueline Regis, St. Paul, Minn., for appellee.

Before WOLLMAN, Circuit Judge, HEANEY and FRIEDMAN,\* Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Minnesota (Magnuson, J.) granting summary judgment dismissing a suit under 42 U.S.C. § 1983 (1988) by an inmate of a state prison against prison officials growing out of the stabbing of the inmate by another inmate. The victim contends that the prison officials subjected him to cruel and unusual punishment, in violation of the standards of the Eighth Amendment, by failing to protect him from the attack. The district court held that based on the facts in the record, a reasonable jury could not have found that the defendants violated the

victim's Eighth Amendment rights. We affirm.

I.

A. Michael E. Wright was tried and convicted on November 8, 1984, in a Minnesota state court in Ramsey County of two counts of second degree assault, two counts of false imprisonment and one count of unlawful possession of a pistol. The assaults were committed against Wright's stepmother and others, and included firing the pistol near the head of one of those assaulted. The court sentenced Wright to five years imprisonment.

Prior to trial, a psychiatrist, Dr. Karayusuf, examined Wright to determine his fitness to stand trial. Dr. Karayusuf concluded:

The defendant is mentally ill. He does have the capacity to understand the proceedings against him and to participate in his defense. In his current condition he is an extremely depressed individual who, under stress, has a strong potential to engage in either homicidal but more likely suicidal activity. In my opinion, he has a strong likelihood that he will engage in seriously harmful conduct in his present very depressed condition.

· · · · ·

Dr. Karayusuf's report was included in Wright's pre-sentence investigation report (pre-sentence report). The day after sentencing, a Ramsey County corrections official mailed a copy of the pre-sentence report to the appellee Erickson, the warden of the Minnesota Correctional Facility in Stillwater, Minnesota (Stillwater). The same day, the sentencing judge wrote to the state Commissioner of Corrections:

You will note when you read the presentence investigation report that Mr. Wright has been diagnosed as presently mentally ill and as being both a homicidal and suicidal risk. I would, therefore, strongly recommend that Mr. Wright be placed in an appropriate mental health

---

\* DANIEL M. FRIEDMAN, Senior Circuit Judge, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

unit in the institution to which he will be sent.

I am also enclosing some documents delivered to me by Mr. Wright at the time of sentencing. I believe that these documents will shed some light on what can be expected from Mr. Wright during incarceration.

Wright entered Stillwater on November 13, 1984. The next day, following Wright's admission interview, the prison psychologist who interviewed him, Joe Sames, filed a report based on the interview and Wright's file. Sames stated that Wright "remarked that he had been involved in a couple of fights in the County Jail because others provoked him...." Sames concluded:

The fact that his life thus far has been so chaotic and that he also got into difficulty in the County Jail does not bode particularly well for his future prison adjustment. He isn't overtly suicidal now but has thought of this in the past. It is recommended that a behavior-modification program be considered, as well as further medical investigation of his physical complaints. Otherwise, he should be assisted in routine prison planning and activities. After due consideration of all of the above, it is anticipated that his prison adjustment likely will be marginal.

On November 14, 1984, Stillwater's consulting psychiatrist, Dr. Osekowsky, also interviewed Wright, who was referred "because of concerns about homicidal or suicidal tendencies or both." Dr. Osekowsky's report stated:

He has shot people in the past but represents it as incidents which occurred out of feeling that he was going to be attacked. There seems to be a number of these incidents in the past, however. At the present time, he denies being significantly depressed and feels no particular threat from the population. He is a very recent arrival to the prison and will be doing 40 months. He tends to get into altercations with people, and this extends to his employment history, as well. I don't think I need to see him again, but he could bear some continuing evaluation

by Joe Sames. There may be a paranoid element here that needs attention. He could then be referred back to me.

Dr. Osekowsky interviewed Wright a second time on November 29, 1984. His report of that interview concluded:

Mr. Wright looks considerably more comfortable and in a brighter mood than he has in awhile. He is instituting an appeal. He states that his previous incarcerations have involved minimum custody, and he had a little difficulty getting adjusted to this kind of custody.

I suspect that there is some level of paranoid disorder present in this man, but, for the moment, he seems to [be] functioning well. I am not going to see him again unless I am called upon to do so, but I believe it would be valuable for Psych. staff to look in on Mr. Wright once in awhile.

On December 18, 1984, Wright's caseworker, Mark Thielen, filed an "Initial Case Management Summary" regarding Wright. As an inmate's assigned caseworker, Thielen normally reviewed court documents (including pre-sentence reports) and psychological evaluations relating to newly-admitted inmates, and made recommendations regarding the inmate's incarceration. In his summary, Thielen recommended "routine institution programming with an emphasis on pursuing education in the Insight program [a college-level education program] or completion of course through the Rasmussen School. The only condition that would appear to be feasible under the program conditions, is a behavior modification setting...." Thielen stated in his deposition, however, that he did not know of Wright's earlier diagnosis as mentally ill or as being a homicidal or suicidal risk.

Wright's case was then forwarded to the "Program Review Team" (review team), a committee of Stillwater officials and employees responsible for deciding whether an inmate should be incarcerated in Stillwater or elsewhere, and under what conditions. The appellee Siegel was then the chairman of the review team. The review team reviewed Wright's case file on December 27, 1984, and recommended that he

remain at Stillwater under the following program plan:

> We strongly recommend that Mr. Wright enter and successfully complete the ATC Program at Lino Lakes [a "therapeutic community program"] at the appropriate time. He was informed that in April 1986, ... he would be expected to have applied for ATC. If he does so he will be allowed to continue in any incentive assignment he may be in. Should he change his mind about ATC, then all incentive assignments would terminate at that time.

> .    .    .    .    .

> We encourage his interest in the Insight Program [a college-level education program], which he should be able to continue in no matter what type of assignment he is in. It is also possible that Insight will have an extension of the program at Lino Lakes.

Wright was placed in the general prison population.

In April 1985, the state Commissioner of Corrections, in replying to a letter from the state trial judge "regarding the mental status" of Wright, stated:

> At this time he is getting along very well at the Stillwater facility and is participating in a vocational welding program. He recently completed testing for the Insight program which is a college level educational program. His plans also include eventual participation in the therapeutic community program at our Lino Lakes facility when he becomes eligible for transfer. His caseworker reports that he has adjusted very well and has not demonstrated any mental or psychological problems.

B. In June 1985, the appellant Andrews, an inmate at Stillwater, worked in the bus repair program there. On June 25, 1985, Wright was assigned to and began to work in that program. None of the defendants in this case participated in the decision to assign him to the program.

On August 1, 1985, Andrews and Wright had an argument in the repair shop. Andrews alleged that this confrontation "escalated to the point where other inmates in-

tervened and it was witnessed by other guards...." The next day, while working in the repair shop, Wright was told to sharpen a screwdriver. He then stabbed Andrews with the screwdriver seriously injuring him. These two incidents constituted the only apparent contact between Andrews and Wright.

Andrews *pro se* filed the present suit in the district court, alleging that state corrections officials and the State of Minnesota failed adequately to protect him against Wright's assault, in violation of the Eighth Amendment, and seeking compensatory and punitive damages under 42 U.S.C. § 1983.

The defendants moved to dismiss. Discovery was had and both sides filed affidavits. The United States Magistrate, to whom the district court referred the case, treated the motion to dismiss as one for summary judgment because it relied on matters outside the pleadings. *See* Fed.R. Civ.P. 12(b). The magistrate recommended (1) that the State of Minnesota be dismissed as a defendant because the Eleventh Amendment immunized it from suit, and (2) that the remaining defendants' motion for summary judgment be granted since Andrews "has not shown that defendants deliberately disregarded his eighth amendment right to be free from violent attacks by other inmates." *Andrews v. Siegel*, No. 3-86-737, Magistrate's Report and Recommendation at 11 (Jan. 17, 1990).

In rejecting Andrews' claim that Wright presented a "pervasive risk of harm" to Andrews and others, the magistrate stated:

> In this case, plaintiff does not complain of frequent attacks upon inmates by inmate Wright which put plaintiff in reasonable fear for his safety, and put defendants on notice that protective measures were necessary. In fact, in his affidavit submitted in response to defendants' summary judgment motion, plaintiff admits that he was unaware of any violent tendencies on the part of inmate Wright. Further, there is nothing in the record to indicate that inmate Wright was involved in any violent attacks at

[Stillwater] prior to his attack upon plaintiff. Plaintiff has merely alleged a single incident of violent behavior by inmate Wright, not sufficient to show a pervasive risk of harm.

*Id.* at 7–8 (citation omitted). With respect to Andrews' claim that there had been an altercation between Wright and another Stillwater inmate prior to Wright's stabbing of Andrews, the magistrate concluded that "even if the altercation did take place as plaintiff alleges, plaintiff has still only alleged isolated incidents of violence by inmate Wright, not sufficient to show the existence of a pervasive risk of harm." *Id.* at 8 (citation omitted).

The district court, based upon its *"de novo* review of the record ... and on consideration of the submissions of the parties," adopted the magistrate's report and recommendation, dismissed the State of Minnesota from the action, and granted the motion of the other defendants for summary judgment. *Andrews v. Siegel,* No. 3–86–737, slip op. (D.Minn. Apr. 3, 1990). In this appeal, Andrews does not challenge the dismissal of the State of Minnesota.

## II.

■ A. To prevail in a suit under 42 U.S.C. 1983, an inmate seeking damages from prison officials for subjecting him to cruel and unusual punishment by failing to protect him from assault by another inmate "must show something more than mere inadvertence or negligence. He must show the defendants were deliberately indifferent to his constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates." *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.), *cert. denied,* 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984), (quoting *Branchcomb v. Brewer,* 669 F.2d 1297, 1298 (8th Cir.1982)). To establish "reckless disregard" by prison officials, an inmate must show that he was faced with a "pervasive risk of harm" and that the prison officials failed to respond reasonably to that risk. *Bailey v. Wood,* 909 F.2d 1197, 1199 (8th Cir.1990); *Porm v. White,* 762 F.2d 635,

637 (8th Cir.1985). Moreover, a "pervasive risk of harm"

"may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency that prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures...."

*Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984) (quoting with approval *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980)); *see also Bailey,* 909 F.2d at 1199 (jury instruction on "pervasive risk").

■ B. Under these standards and drawing all inferences from the record in favor of Andrews, the district court correctly granted summary judgment dismissing the complaint because Andrews has not shown that appellees recklessly disregarded, or were deliberately indifferent to, his Eighth Amendment right to be free from violent attacks by other inmates.

1. Andrews does not contend that Wright's conduct while at Stillwater gave any indication that he posed a danger to Andrews. The only previous contact between the two inmates was on the day before the stabbing, when they got into an argument and were separated by other prisoners.

That argument did not portend any violence by Wright against Andrews or warrant any action by prison authorities to protect Andrews from Wright. As the magistrate pointed out, Andrews "does not allege that he told the [appellees] about the altercation or that he requested protection from inmate Wright." *Andrews v. Siegel,* No. 3–86–737, Magistrate's Report and Recommendation at 9. Moreover, as we have noted, "some violence in prisons may be unavoidable due to the character of the

prisoners...." *Martin*, 742 F.2d at 475 (citations omitted).

Unlike *Bailey*, this is not a case where there was a history over a considerable period of time of hostility and violence by one inmate to another.

2. Andrews' theory is that when Wright was received at Stillwater, the reports relating to him should have alerted the officials and staff of the prison that he posed a danger of inflicting serious injury upon all the inmates, including Andrews. Andrews contends that in the circumstances, the prison officials improperly permitted him to be placed in the general prison population, instead of segregating him or assigning him to another facility at which mentally ill prisoners were kept. According to Andrews, the information furnished to the prison authorities at Stillwater showed that Wright was seriously mentally ill and, in the words of Dr. Karayusuf's report, had "a strong likelihood" that he would "engage in seriously harmful conduct...."

What Dr. Karayusuf actually said, however, was that Wright had such a likelihood "in his present very depressed condition." Dr. Karayusuf's other statement regarding Wright's "strong potential to engage in either homicidal but more likely suicidal activity" similarly was qualified by noting that this potential related to Wright's "current condition" as "an extremely depressed individual who, under stress," had such potential. The letter from the sentencing judge to the state corrections commissioner commenting on Wright's mental illness was primarily based upon Dr. Karayusuf's comments.

The Stillwater psychiatrist, Dr. Osekowsky, twice examined Wright shortly after his arrival at the institution. On neither occasion did Dr. Osekowsky conclude that Wright could not safely be assigned to the general prison population. Indeed, after the second interview, Dr. Osekowsky stated that Wright "looks considerably more comfortable and in a brighter mood than he has in awhile." Dr. Osekowsky's conclusions were not inconsistent with Dr. Karayusuf's earlier conclusion, when Wright was awaiting trial, that "in his present very depressed condition," there was a "strong likelihood that he will engage in seriously harmful conduct...." Apparently, Wright's "very depressed condition" had improved substantially by the time he reached Stillwater.

The question in determining whether Andrews presented sufficient facts to support a claim of cruel and unusual punishment is not, as Andrews apparently sees it, whether Wright suffered from a mental illness. Rather, the question is whether in view of all the circumstances, the prison officials at Stillwater "acted with deliberate indifference or in reckless disregard of [Andrews'] rights...." *Bailey*, 909 F.2d at 1198. The prison officials referred Wright on his admission to the prison psychiatrist "because of concerns about homicidal or suicidal tendencies" thereby reflecting their sensitivity to the possible problems he posed. The appellees justifiably relied on the professional judgment of the prison psychiatrist that at the time of his interviews, Wright did not pose a serious threat to other inmates because of his mental condition or require special treatment.

That conclusion is confirmed by the fact that, during the approximately seven months after Wright joined the general prison population, there is no indication that he had any problems, disputes, or altercations with any other prisoner until his argument with Andrews on August 1, and his stabbing of Andrews the following day. Indeed, in April, Wright's caseworker had reported that Wright was "getting along very well," had "adjusted very well and has not demonstrated any mental or psychological problems."

Dr. Osekowsky noted in his second report that Wright had appealed from his conviction. Wright's appeal failed when his conviction was affirmed on July 16, 1985. *State v. Wright*, 371 N.W.2d 238 (Minn.Ct.App.1985). The appellees cannot be faulted for failing to follow the progress of his appeal or, if they were aware of the result, for not realizing that the affirmance might create a new depression for Wright and cause him to take violent action against another inmate.

**1332**

The admission procedures the prison officials followed and the decision to place Wright in the general prison population—to the extent, if any, that the appellees were responsible therefor—were reasonable in the circumstances. In any event, the appellees' conduct did not rise to the level of "obduracy and wantonness ... that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

The judgment of the district court is affirmed.