Jay HOLLOWAY, Plaintiff,

v.

Ken WITTRY, sued as Ken Wittery; Duane Sherwood; and Raymond Miller, Defendants.

No. 4–92–CV–30285.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 27, 1994.

Jeffrey M. Lipman, Des Moines, IA, for plaintiff.

Kristin W. Ensign, Asst. Atty. Gen., State of Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER

BENNETT, United States Magistrate Judge.

TABLE OF CONTENTS

I.    INTRODUCTION                                    1194
II.   FINDINGS OF FACT                                1195
III.  CONCLUSIONS OF LAW                              1196
      A.  An Overview of the Eighth Amendment         1196
      B.  Pervasive Risk of Harm                      1198
      C.  Failure to Intervene                        1199
      D.  Damages                                     1200
      E.  Attorney Fees                               1202

Plaintiff, Jay Holloway, is an inmate at the Iowa State Penitentiary at Fort Madison, Iowa ("ISP"). On December 10, 1990, he was savagely assaulted and pummeled by four other inmates in ISP's prison industries. In this 42 U.S.C. § 1983 action, Holloway alleges that Defendants, various ISP officials, violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from harm by the attack by the other inmates. Holloway seeks compensatory and punitive damages.

## I. INTRODUCTION

Holloway filed a *pro se* complaint alleging two separate, but related, Eighth Amend-ment claims. First, Holloway alleged that Defendant Miller, a state industry technician, failed to intervene in a fight between himself and four other inmates, and thereby violated the Eighth Amendment's obligation to pro-tect inmates from harm by other inmates. *See generally Smith v. Marcantonio,* 910 F.2d 500, 501 (8th Cir.1990). Second, Hollo-way also alleged that Defendants Wittry and Sherwood, managerial personnel of ISP's prison industries, were ultimately responsible for the beating he sustained because the conditions at ISP's prison industries building created a "pervasive risk of harm." *See generally Martin v. White,* 742 F.2d 469, 472 (8th Cir.1984).

Experienced counsel was subsequently appointed for Holloway. On February 23, 1993, the parties filed a consent to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This case was tried to the court on November 2, 1993. The matter is now fully submitted.

## II. FINDINGS OF FACT

Prison industries at ISP is centered in a four story building. Inmates are assigned to prison industries by a classification committee. Because prison industries is a self-sustained enterprise not subsidized by the State of Iowa, ISP officials attempt to assign only the best behaved inmates to work there. Furthermore, because jobs in prison industries are at the top of the inmate pay structure, inmates have an incentive to be well behaved while working there.[1] There are fewer inmate assaults, in general, in prison industries than in other parts of ISP, such as the yard and gym.

Several security measures are employed in the prison industries building. First, a staff member is required to remain on the floor at all times. There is a staff member assigned to each floor of the prison industries. Second, the industry supervisor makes at least two unannounced rounds of prison industries every day. Additionally, one security officer roves the building the whole day. Third, metal detectors are placed at the entrance to the building. Finally, security checks are made of the tools at the beginning and end of each shift.

Each industry technician carries an emergency beeper by which they can summon security. Defendant Miller carried such a beeper on December 10, 1990. Staff in prison industries are provided with security training. If an inmate requests protection, the industry technician is supposed to provide it by pressing the beeper.[2] In addition to the roving security officer, two correctional officers man the entrance to prison industries.

Holloway arrived at ISP in June of 1989. In December 1989, Holloway began working in ISP's prison industries building. Holloway worked on the second floor of the building in shop area 291. Shop area 291 is a woodshop in which inmates produce desks, credenzas, and other types of furniture for retail sale. Approximately 15 inmates work in the area.

On December 10, 1990, the state industry technician on the second floor of the prison industries building was Defendant Ray Miller.[3] Defendant Duane Ralph Sherwood is ISP's state industry supervisor, and Miller's immediate supervisor. Defendant Kenneth J. Wittry is the plant manager for ISP's prison industries.

On the morning of December 10, 1990, at 6:30 a.m., Holloway commenced work on the second floor of ISP's prison industries building. Holloway was unaware of any inmates who wished to attack him that day. On December 10, 1990, Defendants were unaware of any inmates in prison industries who may have wished to physically harm Holloway. At approximately 9:30 a.m., a correctional officer who was making his rounds in the building stopped on the second floor and engaged an inmate in conversation. Holloway was listening to this discussion when he noticed another inmate motion for him to get the guard out of the area. The inmate who motioned to Holloway and several other inmates had been drinking alcohol in the back of the floor.

After the correctional officer left, the inmate who had motioned to Holloway came up to Holloway and accused him of bringing the correctional officer into the area. The inmate then hit Holloway in the head with his fist three or four times before Holloway knocked the inmate down. There were no correctional personnel in the area at the time of the first assault on Holloway. Almost

---

1. Inmates in segregated status for discipline problems or in restricted cell blocks are not permitted to work in prison industries.

2. When a security beeper is set off at ISP, the control center receives the alarm and in turn notifies security, medical, and other prison personnel.

3. On December 10, 1990, the state industry technician who was usually assigned to the second floor, Bill Whitaker, was absent.

immediately after Holloway managed to knock his assailant down, three other inmates attacked Holloway. These three inmates hit Holloway with chair frames. Holloway ran into another room in which Defendant Miller was at his desk. The assault ceased at this junction, and Holloway was able to go to the rest room on the floor and wash blood from his face. Holloway did not ask Miller for assistance or speak to Miller at this time.

After Holloway finished washing up, he went to his work area and sat down on a chair. Holloway's work station was approximately 20 feet from Miller's desk. Miller was at his desk at this time.[4] He was soon assaulted again by the same four inmates. Miller witnessed this portion of the attack. At one point during this attack, Holloway had one of his eyelids poked into his eye. Holloway retreated about ten feet and the second assault ended. He then went back to his work station. By this time Miller was in an adjacent shop area. Miller had left his desk during the second assault without intervening in the assault or summoning assistance.

The inmates then attacked Holloway a third time. Holloway ran to within ten feet of Miller, who was showing two inmates how to run some machinery. Although Miller witnessed this part of the altercation, he took no steps to either intervene in the attack or to summon correctional personnel to aid Holloway. The assault then stopped briefly. Before Holloway could leave the prison industries building, he was assaulted a fourth time by the four inmates. On this occasion, Holloway was trapped in a corner, knocked to the ground, and beaten while lying in the fetal position. The fourth assault on Holloway occurred immediately adjacent to the place where the third assault had occurred and was witnessed by Miller. During the

assault on Holloway, inmates gathered around in a circle to watch the fight. The entire period of attacks upon Holloway lasted approximately 20 minutes.

At some point following the fourth, and final assault, Miller called Sherwood, his supervisor, who in turn notified ISP security. Holloway was taken to the prison infirmary. He spent two days there being treated for a broken bone in his hand, and cuts and abrasions over his upper torso, arms, hands and head. Pain from his wounds lasted approximately two and one-half months. Holloway was questioned by ISP security. Holloway, not wishing to be labelled a "snitch" by other inmates, lied to ISP security and told them he had fallen down a flight of stairs.[5] Holloway was subsequently placed in involuntary protective custody—where he remains.

## III. CONCLUSIONS OF LAW

### A. An Overview of the Eighth Amendment.

The Eighth Amendment prohibition of "cruel and unusual punishments" has its origin in English law.[6] *Furman v. Georgia,* 408 U.S. 238, 316, 92 S.Ct. 2726, 2766, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring). Prior to the adoption of the English Bill of Rights in 1689, a prohibition against "excessive punishments in any form" had developed in English common law over the centuries. *See* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Cal.L.Rev. 839, 844–47 (1969). The language used in the Eighth Amendment first appeared in the 1689 English Bill of Rights, which was drafted by Parliament and ratified at the accession of the new monarchs, William and Mary. *Gregg v. Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) (citing Granucci, *supra,* at 852).[7] In 1776, Virginia adopted verbatim

---

4. Miller's desk sits on a raised platform which provides a good view of the inmate work stations.

5. Holloway didn't want to name the inmates who attacked him because he wanted to have a "good reputation" among the staff and inmates.

6. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines

imposed, *nor cruel and unusual punishments inflicted."* (emphasis added).

7. "The tenth declaratory clause of the bill reads: 'That excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted.'" Granucci, *supra,* at 852–53 (citation omitted).

this language from the English Bill of Rights in its own Declaration of Rights. *Furman,* 408 U.S. at 319, 92 S.Ct. at 2767 (Marshall, J., concurring). Eight other states soon adopted this clause, and in 1791 it became the Eighth Amendment to the United States Constitution. Granucci, *supra,* at 840.

In an analysis of the original meaning of the Eighth Amendment's "cruel and unusual" punishment clause, the Supreme Court recognized that:

> [t]he English version appears to have been directed against punishments unauthorized by statute and beyond the jurisdiction of the sentencing court, as well as those disproportionate to the offense involved.... The American draftsmen ... were primarily concerned, however, with proscribing 'tortures' and other 'barbarous' methods of punishment.

*Gregg,* 428 U.S. at 169–70, 96 S.Ct. at 2923 (joint opinion) (citing Granucci, *supra,* at 842, 860); *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The Eighth Amendment was adopted with the intention of placing limits on the government and the potential abuse of its power against persons convicted of crimes. *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 266, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989).

The earliest Eighth Amendment claims before the Supreme Court "focused on particular methods of execution to determine whether they were too cruel to pass constitutional muster." *Gregg,* 428 U.S. at 170, 96 S.Ct. at 2923 (citing *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1878); *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933–34, 34 L.Ed. 519 (1890)). In these early cases, the Court restricted its Eighth Amendment inquiry to whether the methods of execution were torturous or barbarous within the Amendment's original meaning. *Estelle,* 429 U.S. at 102, 97 S.Ct. at 290. The Court, however, "has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg,* 428 U.S. at 171, 96 S.Ct. at 2924. In *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Supreme Court moved away from a historical interpretation of the Eighth Amendment and stated: "Time works changes, [and] brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is particularly true of constitutions." *Weems,* 217 U.S. at 373, 30 S.Ct. at 551. The Court went on to point out that the Eighth Amendment's cruel and unusual punishments clause has an "expansive and vital character," which "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by human justice." *Id.* at 377, 378, 30 S.Ct. at 533; *see also Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 597–98, 2 L.Ed.2d 630 (1958) ("[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"); *Gregg,* 428 U.S. at 172–73, 96 S.Ct. at 2925 ("the Eighth Amendment has not been regarded as a static concept"); *Estelle,* 429 U.S. at 102–03, 97 S.Ct. at 290 ("the Amendment proscribes more than physically barbarous punishments"); *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968) ("broad and idealistic concepts of dignity, civilized standards, humanity, and decency" help define the Eighth Amendment proscriptions).

"[P]ublic perceptions of standards of decency with respect to criminal sanctions are not conclusive." *Gregg,* 428 U.S. at 173, 96 S.Ct. at 2925. A penalty must also comply with the "dignity of man." *Id.* (quoting *Trop v. Dulles,* 356 U.S. at 100, 78 S.Ct. at 597). The punishment "must not involve the unnecessary and wanton infliction of pain [or] ... be grossly out of proportion to the severity of the crime." *Id.* (citations omitted). "Until recent years, [however,] the Cruel and Unusual Punishment Clause was not deemed to apply at all to deprivations that were not inflicted as part of the sentence for a crime." *Hudson v. McMillian,* — U.S. —, —, 112 S.Ct. 995, 1005, 117 L.Ed.2d 156 (1992) (Thomas, J., dissenting). The Eighth Amendment was not considered to protect inmates from harsh treatment by prison officials. *Id.* "It was not until 1976—185 years

after the Eighth Amendment was adopted—that [the] Court first applied it to a prisoner's complaint about a deprivation suffered in prison." *Id.* at ——, 112 S.Ct. at 1006.

In *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), the Supreme Court extended the application of the cruel and unusual punishment clause to inmate deprivations which were not part of an inmate's sentence. *Hudson,* —— U.S. at ——, 112 S.Ct. at 1001; *Wilson v. Seiter,* 501 U.S. 294, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). In *Estelle,* the Court recognized that post-sentencing conditions of confinement could constitute "cruel and unusual punishment" where plaintiff could prove "deliberate indifference" on the part of prison officials to the serious needs of prisoners. *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92.[8] Following *Estelle,* courts have concluded that " 'deliberate indifference' of a constitutional magnitude may occur when prison guards fail to protect one inmate from an attack by another inmate." *Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir.1990); *see also Martin,* 742 F.2d at 474; *Roland v. Johnson,* 856 F.2d 764, 769–70 (6th Cir. 1988).[9] The court will address each of Holloway's claims *seriatim.*

### B. Pervasive Risk of Harm.

■ Holloway contends in this § 1983 action that Defendants Wittry and Sherwood violated his Eighth Amendment rights because they permitted a pervasive risk of harm to exist in ISP's prison industries. In order for Holloway to prevail under 42 U.S.C. § 1983 on the ground that correctional personnel subjected him to cruel and unusual punishment by their failure to protect him from assaultive behavior of other inmates, he

> "must show something more than mere inadvertence or negligence. He must show the defendants were deliberately in-

different to his constitutional rights, either because they actually deprived him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates."

*Andrews v. Siegel,* 929 F.2d 1326, 1330 (8th Cir.1991) (quoting *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.), *cert. denied,* 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984)); *see Falls v. Nesbitt,* 966 F.2d 375, 378 (8th Cir. 1992).

■ In order to establish "reckless disregard" by correctional personnel, an inmate must first show that he was faced with a "pervasive risk of harm." *Falls,* 966 F.2d at 378; *Andrews,* 929 F.2d at 1330. Second, the inmate must demonstrate that the correctional officials "failed to respond reasonably to that risk." *Falls,* 966 F.2d at 378; *Andrews,* 929 F.2d at 1330. A "pervasive risk of harm"

> "may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency that prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures...."

*Andrews,* 929 F.2d at 1330 (quoting *Martin,* 742 F.2d at 474); *Falls,* 966 F.2d at 378.

■ Here, Holloway has failed to establish the threshold issue, that the conditions which existed at ISP's prison industries created a pervasive risk of harm. Although Holloway established that other assaults had occurred in prison industries, the infrequency of these assaults was such that inmates who worked in prison industries would not be put in fear for their safety. Defendants presented cred-

**8.** In *Estelle,* the plaintiff brought suit against prison authorities for failure to provide him with appropriate medical care. *Estelle,* 429 U.S. at 99–101, 97 S.Ct. at 288–89.

**9.** Prior to *Estelle,* the Eighth Circuit and other courts had already recognized a cause of action premised on a failure of prison authorities to protect inmates from physical assaults. *See*

*Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir.1973) (noting that "[a] prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates ..."); *Holt v. Sarver,* 442 F.2d 304, 308 (8th Cir.1971).

ible rebuttal testimony, through John Emmett, that less assaults occur in prison industries than other parts of the prison.[10]

█ Even if the court assumes for the sake of argument that Holloway had established the first prong of the reckless disregard for safety analysis, he did not establish that prison officials failed to respond to that risk. Several security measures are employed to protect inmates from such assaultive conduct. First, a staff member is required to remain on the floor at all times. Additionally, one security officer roves through the building the whole day, and security checks are made of the tools. Here, if Miller had activated his emergency beeper in a timely fashion, the assaultive conduct could have been substantially curtailed. Thus, the court concludes that the fault here lies not with the plan itself but with its execution by staff.

It must also be noted that Holloway, and the other inmates of ISP, help foster such violent attacks by their code of silence. Their non-cooperation with prison officials permits such predatory actions to occur with impunity, and allows those inmates responsible for such violence to escape punishment and remain free within the prison system to commit other acts of terror. Inmates must realize they have a shared responsibility within the prison environs to take those steps which facilitate and promote inmate safety.

For the reasons stated above, the court holds Holloway has failed to prove that Defendants Sherwood or Wittry violated the Eighth Amendment's prohibition against cruel and unusual punishment.

## C. Failure to Intervene.

Holloway also alleges that Defendant Miller failed to take action to intervene in the fight or to request assistance for him from correctional personnel. As the Eighth Circuit recently pointed out:

The Eighth Amendment prohibition against cruel and unusual punishment im-

poses upon correctional officers the obligation to protect inmates from harm by other inmates. *See, e.g., Smith v. Marcantonio,* 910 F.2d 500, 501 (8th Cir.1990). An Eighth Amendment violation is actionable under section 1983 if the plaintiff shows that the "defendants were deliberately indifferent to his constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates." *Falls v. Nesbitt,* 966 F.2d 375, 377–78 (8th Cir.1992) (quoting *Andrews v. Siegel,* 929 F.2d 1326, 1330 (8th Cir.1991)). A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault. *See Wright v. Jones,* 907 F.2d 848, 850 (8th Cir.1990); *Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir.1990); *Ayala Serrano v. Lebron Gonzalez,* 909 F.2d 8, 14 (1st Cir.1990); *Benny v. Pipes,* 799 F.2d 489, 495 (9th Cir.1986), *amended,* 807 F.2d 1514 (9th Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987).

*Williams v. Meuller,* 13 F.3d 1214, at 1216 (8th Cir.1994).

The Eighth Circuit, however, has concluded that under some circumstances a correctional officer's failure to intervene in an inmate fight does not constitute an Eighth Amendment violation where the correctional officer's decision to not intervene is supported by justifiable evidence. *Id.,* at 1216; *see Williams v. Willits,* 853 F.2d 586, 591 (8th Cir.1988) (holding that where correctional officers ordered inmates to stop fighting and one guard was threatened while trying to intervene in a fight, guards "made the perfectly reasonable decision that further intervention would threaten the health and safety of all concerned."); *see also Arnold v. Jones,* 891 F.2d 1370, 1372 (8th Cir.1989) (holding that unarmed guards' failure to in-

---

10. Emmett is ISP's correctional security director and the acting deputy warden of operations. He is responsible for security at ISP. Because, as part of his job as security director, he is apprised of assaults which occur at ISP and he has specific knowledge concerning the frequency and location of assaults.

tervene does not constitute Eighth Amendment violation when intervention could result in either serious injury or worsen the situation).

■ In this case, Defendant Miller asserts that the reason he did not press his emergency beeper was that he did not see the altercation between Holloway and the four other inmates. The court has rejected this factual assertion.[11] Here, the court has found Miller's testimony that he did not witness any of the altercation to be completely implausible given the physical dimensions of the second floor, the fact that the assaults occurred out in the open, changed locations on three occasions, directly involved five adult males, drew the attention and presence of other inmates on the floor, and occurred over a twenty minute time period. A further consideration was the fact that Miller had a direct interest in the outcome of this trial. This interest provided Miller with an incentive to tailor his testimony in a light most favorable to his defense. Finally, the court found Miller's demeanor and credibility during his testimony inconsistent with his assertion that he did not witness any of the altercation. Having concluded that Miller had been less than forthcoming regarding what he witnessed of the assaults on Holloway, the court rejects his testimony. Miller's inaction in the face of imminent danger to Holloway's safety by the gang assault on him can only be considered deliberately indifferent. *See Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir.1990) (upholding a jury's determination that correctional officers had violated the Eighth Amendment by their inaction to prevent the stabbing of an inmate); *Ayala Serrano v. Lebron Gonzalez,* 909 F.2d 8, 14 (1st Cir.1990) (holding that correctional officer's

failure to come to aid of inmate or to summon the help of guards violated the Eighth Amendment).

### D. Damages.

Holloway seeks both compensatory and punitive damages. "In a section 1983 action, both compensatory and punitive damages are available upon proper proof." *Cunningham v. City of Overland,* 804 F.2d 1066, 1069 (8th Cir.1986). The United States Supreme Court has repeatedly observed that 42 U.S.C. § 1983 was intended to create " " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges or immunities secured' to them by the Constitution.' " " *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978), (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988–89, 47 L.Ed.2d 128 (1976))); *see also Smith v. Wade,* 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981). The Supreme Court has also noted the basic purpose of section 1983 is to compensate "persons for injuries that are caused by the deprivation of constitutional rights." *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). Thus, when a § 1983 plaintiff "seeks damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura,* 477 U.S. at 306, 106 S.Ct. at 2542. The Court has recognized that "once liability is found ... the [court] ... is required to award compensatory damages in an amount appropriate to compensate plaintiff for his loss." *Smith v. Wade,* 461 U.S.

---

11. The court has utilized the following factors for assessing the credibility of Miller, Holloway and the other witnesses who testified and in rejecting Miller's testimony that he did not see any of the assault: (1) the interest of the witness in the result of the trial; (2) the witness' relation to any party in interest; (3) the witness' demeanor upon the witness stand; (4) the witness' manner of testifying; (4) the witness' tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (5) the witness'

apparent capacity and willingness to truthfully and accurately tell what he or she saw and observed; and (6) whether the witness' testimony is either supported or contradicted by other evidence in the case. *See United States v. Phillips,* 522 F.2d 388, 391 (8th Cir.1975); *United States v. Merrival,* 600 F.2d 717, 719 (8th Cir.1979); *Clark v. United States,* 391 U.S. 57, 60 (8th Cir.), *cert. denied,* 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); *see also Manual of Model Jury Instructions for the District Courts of the Eighth Circuit* 3.03 (1993).

30, 52, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). "Generally, compensatory damages should attempt to place the plaintiff in a position similar to the one she or he would have been in had the violation not occurred." *City of Overland*, 804 F.2d at 1069. Notwithstanding the fact that all of Holloway's damages are not quantifiable with precision, his injuries nonetheless give rise to actual consequential damages. *See Corriz v. Naranjo*, 667 F.2d 892, 898 (10th Cir.1981), *cert. granted*, 456 U.S. 971, 102 S.Ct. 2233, 72 L.Ed.2d 844, *cert. dismissed*, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982).

■ Unlike compensatory damages, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura*, 477 U.S. at 306 n. 9, 106 S.Ct. at 2542 n. 9. In order for Holloway to be entitled to punitive damages under § 1983, he must, at a minimum, demonstrate that the conduct of Miller constituted a "reckless or callous disregard" for the federally protected right. *Smith*, 461 U.S. at 51, 103 S.Ct. at 1637. The Eighth Circuit has consistently awarded damages to inmates whose Eighth Amendment rights had been violated. *See generally Wade v. Haynes*, 663 F.2d 778, 786 (8th Cir.1981) (upholding plaintiff's award of $25,000 in compensatory damages and $5,000 in punitive damages against a correctional officer for damages sustained from beatings and sexual assaults committed by other inmates), *aff'd sub nom., Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Thomas v. Booker*, 762 F.2d 654, 660 (8th Cir.1985) (affirming plaintiff's judgment for compensatory and punitive damages from defendant jail officials because of defendants' reckless disregard of plaintiff's right to be free from violent attacks by fellow inmates),

*cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986); *see also Martin*, 742 F.2d at 473 n. 5 (noting that correctional official may be held liable for both compensatory and punitive damages when they act in reckless disregard of inmate's right to be safe from assaults by other inmates).[12]

■ Holloway has demonstrated both actual physical and emotional injury. Accordingly, Holloway is entitled to a compensatory damage award. The problem in assessing damages in this case flows from the fact that it is impossible to discern with precision what physical injuries Holloway sustained when he was initially accosted by the four inmates, which was not viewed by Miller, from those injuries which arose because of Miller's inaction. It is clear that after Miller first observed the second portion of the fight that Holloway was accosted on two other occasions, suffering additional physical injuries on both occasions. The court finds that damages of $500.00 for Holloway is appropriate compensation for the deprivation of his Eighth Amendment rights.[13]

■ Likewise, the court believes that Holloway has demonstrated that Defendant Miller acted with a willful, reckless, malicious and callous disregard for Holloway's federally protected right to be free from cruel and unusual punishment. Miller's failure to seek assistance for Holloway while Holloway was repeatedly pummeled by other inmates is unconscionable. Under these circumstances, punitive damages are needed to punish Miller and deter future behavior of a like kind. The court, therefore, assesses punitive damages against Defendant Miller in the sum of $1,000.00.

**12.** Other circuits have similarly awarded compensatory and punitive damages for prison officials' violations of inmates' Eighth Amendment rights. *See Walker*, 917 F.2d at 1459 (affirming compensatory award of $175,000 and punitive damage awards of $2000 and $2,500 against prison personnel who failed to protect inmate from fatal stabbing at the hands of another inmate); *Matzker v. Herr*, 748 F.2d 1142, 1149 (7th Cir.1982) (holding that plaintiff stated a claim for compensatory and punitive damages from jail officials for failing to reasonably protect him

from attacks by fellow inmates); *Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir.1983) (affirming plaintiff's compensatory award of $70,000 and award of $310,000 in punitive damages against jail officials for their failure to protect inmate from physical assault by other inmates).

**13.** Significantly greater compensatory damages would have been awarded Holloway but for the fact that he received a significant beating prior to Miller's ability to seek intervention on his behalf.

### E. Attorney Fees.

■ Holloway is a prevailing party within the meaning of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *See generally, Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) ("They prevailed on a significant issue in the litigation and have obtained some of the relief they sought and are thus 'prevailing parties' within the meaning of § 1988."); *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.... In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.").

Indeed, it is clear that statutory attorney fees awarded under 42 U.S.C. § 1988 are part of the "arsenal of remedies to combat violations of civil rights." *Evans v. Jeff D.,* 475 U.S. 717, 732, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986). Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), as amended December 1, 1993, Holloway shall have fourteen (14) days from the entry of judgment to file his motion for reasonable attorney fees and costs.

### ORDER

It is therefore the order and judgment of the court that judgment be entered in favor of Plaintiff Holloway against Defendant Miller in the amount of $500.00 in compensatory damages, $1,000.00 in punitive damages, and reasonable attorney fees and costs. Costs shall be taxed to Defendant Miller. The court further orders that judgment be entered in favor of Defendants Wittry and Sherwood against Plaintiff Holloway.